IN THE FEDERAL DISTRICT COURT FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA

        Plaintiff,

vs.                                CASE NO. CR 07-157-SLR

PHILIP GRAHAM,

        Defendant.

---

MOTION TO SUPPRESS
EVIDENTIARY HEARING REQUESTED

    PHILIP GRAHAM respectfully requests this court suppress all evidence seized relating to the execution of the search warrant (Exhibit 1) for the reasons contained in the attached brief and based upon the evidence produced at a hearing on this motion.

                                                /s/

Clayton A. Sweeney, Jr.

DE Bar No. 3359
PO Box 55441
Philadelphia PA 19127-5440

(215) 509-1012
(215) 509-1013 (f)
clayt2@verizon.net

**PENDING ADMISSION**
**PRO HAEC VICE**
Dean Boland 0065693
18123 Sloane Avenue
Lakewood, Ohio 44107
216-529-9371 ph
866-455-1267 fax
dean@deanboland.com

<u>LAW AND EXPLANATION</u>

The Fourth Amendment to the United States Constitution recognizes the right of the people to be protected from the government's unreasonable searches and seizures and mandates that no search warrant shall issue "but upon probable cause, supported by oath or affirmation...." U.S. Const. amend. IV.

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). While an affidavit can include hearsay, as the one in this case does, "an issuing magistrate could find probable cause if the informant's hearsay information is corroborated, or the informant is "an unquestionably honest citizen." <u>Gates</u> at 233, 244, 103 S.Ct. at 2330, 2335. Conclusory statements fail to meet the probable cause requirement; the reviewing magistrate cannot abdicate his or her duty and become a mere ratifier of the bare conclusions of others. <u>Gates</u>, 462 U.S. at 238, 103 S.Ct. 2317. And, pursuant to <u>Gates</u>, the reviewing court is required to ensure that a substantial basis existed to support the magistrate's probable cause determination. <u>Id</u>. at 238-39, 103 S.Ct. 2317.

Evidence seized using a warrant supported by a "bare bones" affidavit must be suppressed. (See <u>United States v. Loy</u>, 191 F.3d 360, 368 (3rd Cir.1999); <u>United States v. Hodge</u>, 246 F.3d 301, 305 (3rd Cir.2001) at 309.

<u>Use of Hearsay in Search Warrant Affidavits</u>

It is the rule of <u>Aguilar v. Texas</u>, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), that "although an affidavit (submitted to support the issuance of a search warrant) may be based

on hearsay information . . . the magistrate must be informed on some of the underlying circumstances from which the informant concluded that" evidence of crime was to be found in the place to be searched.  (378 U.S. at 114, 84 S.Ct. at 1514).

Affiant just concludes that site had contraband.  Did not indicate whether it also had legal content.  Did not indicate whether all subscribers were given access.  Did not indicate whether Graham, whom allegedly subscribed, actually downloaded anything from the site.  This is easy to obtain.  View records of the site following Graham's purchase of the subscription.  No indication that Graham saw any web page that indicated anything illegal was available on the site.  People can click on links from infinite sources to reach the same web page.  Some know are provided accurate information about the site they are clicking to, some are not.  Especially illegal websites have an incentive to mask their real content while still getting potential subscribers to click on links and visit their site.

The affiant here is FBI Agent William Horn.  He claims that the "instant investigation" has revealed that Mr. Graham "purchased at least two subscriptions to a website" that was distributing contraband images.  (Exhibit 1 at ¶6).  He the proceeds to use terms without definitions to describe the website.  No other site information is provided except this conclusory statement (not sourced to Horn or any other law enforcement officer) that the site to which Mr. Graham allegedly subscribed was involved in distributing contraband images.

In ¶15 he references "agents with ICE" located a website known as the "illegal CP" website.  Yet, the site is not at the address www.illegalcp.com.  It is actually at an innocuous sounding address of hualama.cjb.net.  That site, in turn, can only be accessed by clicking through from a site called "http://deadundead.info…."  Neither of those site addresses imply any contraband content will be found at those locations.  How did Mr. Graham, an alleged

subscriber, find these sites?  Was he lured to them under false pretenses from yet another site?

Did he land on deadundead and presume it was a site designed for some other purpose?  The

affiant does not say.  The affiant also does not provide any indication as to basis for the signing

judge to rely upon the "agents with ICE" and their conclusions about the content of the hualama

site.  Did those agents track down the creators of the "appears to be" images on the main page of

hualama?  Did Mr. Graham see this page with this arrangement of images when he allegedly

subscribed?  The signing judge has no idea and neither does the affiant.

In ¶23, the affiant notes the "website had shifted the contents of the website to another

server located in McLean, Virginia."  Who was the source of that information if not the affiant?

Was all information that was "shifted" accurately represented on the new server?  Did the affiant

compare this new server with the previous server?  Did anyone ever make that comparison to

insure that no mistakes were made by apparent criminals when they "shifted" the key financial

data of their contraband image business?

Log Files

The affiant continues in ¶23 to not that log files existed on the server that tracked

information about alleged subscribers.  The log file contained the alleged subscriber's ID,

member login, email address and the date and time when the member's subscription began along

with the IP address from where the alleged subscriber first established their subscription.  More

importantly, "each video or image...accessed by a member" was reflected in the log files.

Footnote 10 asserts that although the design and graphics of the website was "changed on

numerous occasions" it "always featured" contraband images.  The affiant does not indicate

whether he verified the images displayed were contraband.  Did another officer do so?  If so, that

information was hearsay as to the affiant here and he provided no information to substantiate that claim of images depicting actual minors appearing on the home page of the site.

¶ 26 then provides the conclusory statement that "during the course of the investigation" using "numerous investigative techniques" anonymous "ICE agents" identified ADSOFT as a company "laundering" funds generated from the contraband image sites. Was ADSOFT an otherwise legal operation? Who determined ADSOFT was involved in this illegal laundering? The affiant does not say who the hearsay declaration was that provided that information.

¶37 reveals that the probable cause evidence was more than a year stale by the time agents sought their warrant on the anonymous hearsay information. It alleged that Graham had purchased **a subscription** to the alleged contraband image sites on two dates -- May 23, 2006 and June 16, 2006. Those subscriptions were for 20 days of access. (See ¶14). The log files mentioned above contained information regarding which user downloaded which files. This affidavit reveals that Graham did not ever download anything from the sites during either of those 20 days subscriptions. In addition, the latest of the two subscription purchases was done more than 16 months prior to the search warrant request. The affiant provides no basis for the signing judge to conclude that Graham retained anything on his computer from those subscriptions. The signing judge could not possibly have reasonably concluded that Graham did given that the affiant himself had no evidence Graham had ever downloaded anything. Without downloading, there is no retention for any period of time, much less 16 months.

18 U.S.C. 2252 and 2252A do not prohibit subscribing to any website, even one that advertises it contains contraband images. At most, such a subscription evidences an intent to, **at some point in the future**, review the content of the site and, perhaps, download some of that

content.  The affiant had a means to determine whether Graham ever downloaded anything and the four corners of the affidavit reveal that Graham did not.

While the affidavit consumes some 50 pages, the reality is, the portions relevant to Mr. Graham are but a page or two and reveal that the anonymous "ICE agents" had absolutely no evidence that Mr. Graham had ever received or possessed any contraband images.

In recognition of this obvious deficiency of probable cause, the affiant tried to sell the signing judge on probabilities based upon prior searches related to this particular site.  In ¶24 the affiant claims that "90 percent" of the individuals searched as a result of obtaining names from the log files possessed or admitted to possessing contraband images.  The 4th Amendment, however, has no such probability exception.  In fact, its strictures focus on **particularity**, not probability.  If probability were the standard, the application of the 4th amendment would rely solely on after-the-fact analyses of what law enforcement found **after the search** to determine the search validity.  The Constitution does not permit such retrofitted analysis. The analysis here is, what information, specific information relating to Mr. Graham, did the affiant present to the signing judge?  The answer can be summed up in two sentences.  The affiant had information from one or more anonymous hearsay declarants that Mr. Graham's credit card had been used to purchase two 20-day subscriptions to a website claiming to contain contraband images.  Those two 20-day subscriptions had been purchased more than 16 months prior to the presentation of the warrant for signing and the investigator's log files indicated that Mr. Graham had not ever downloaded a single video or image at any time.   From that probable cause, the affiant alleged that Mr. Graham had both received and **currently possessed** contraband images.

This is akin to seeking a warrant to search the residence of a John Q. Public who visited a home, 16 months ago, that was involved in drug trafficking although there is no evidence Mr. Public has ever engaged in criminal activity of any kind, including drug trafficking.

Analysis limited to the Four Corners of the affidavit

The sufficiency of an affidavit, like the determination of an officer's good faith reliance on it, is an assessment confined to the four corners of the affidavit.  (United States v. Hython, 443 F.3d 480, 487).

Constitutional Right versus Probable Cause for Criminal Conduct

Possession of images or digital videos[1] that merely "appear to be" contraband by visual examination is a "First Amendment freedom."  Ashcroft v. Free Speech Coalition 535 U.S. 234, 122 S.Ct. 1389.  The more realistic looking the "appears to be" images are the more deserving of First Amendment protection.  "Protected speech does not become unprotected merely because it resembles the latter.  The Constitution requires the reverse."  Id. at 1404.  "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted ...."  Broadrick v. Oklahoma, 413 U.S., at 612, 93 S.Ct. 2908.

Probable cause in this case means the affiant presented sufficient information to establish that the suspected contraband files on the website were not files representing the exercise of a constitutional right by the possessor that file.  The affiant just concludes the files on the site were contraband without providing the signing judge any basis for that conclusion.  The distinguishing between unaltered and altered digital images is something that not even government expert witnesses are able to reliably do.  The affiant here, nor any of the anonymous hearsay declarants upon which he relied, could possibly have reliably made that determination by visual

---

[1] The terms images and digital videos are used interchangeably for purposes of this motion.

7

examination alone.  The affidavit, however, provides no basis for the claim that the site contained contraband images.

The affidavit, therefore, does not contribute to any probable cause that the person downloading or offering for download this file is engaged in criminal activity versus constitutionally protected conduct.  The affidavit does not state that the affiant confirmed the contraband nature of even one file on the website.  It does not state who, if anyone, has made that determination.  The unknown status of the file is simply labeled in a conclusory fashion as contraband.

The probable cause determination and scrutiny is heightened in cases in which the "suspected" contraband is easily confused with constitutionally protected material.  (Free Speech Coalition).  "[Constitutionally protected and contraband] images…are typically circulated through the Internet."  United States v. Williams, 444 F.3d 1286, 1305-06 (11th Cir. 2006).  As repugnant as the right may be, citizens are entitled to seek out and possess images that "appear to be" contraband.  (Free Speech Coalition).

"Appears to be" contraband images cannot suffice as probable cause of possession of actual images without chilling completely the constitutional right stated in Free Speech Coalition.

Evidence from a search can be suppressed if the affidavit contains statements that were intentionally false or made with reckless disregard for the truth. Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).  In this case, the affiant expresses no personal knowledge regarding the truth of the central fact of the affidavit -- that the website at hualama contained contraband images at all.

There is no corroboration of the anonymous hearsay, double hearsay or triple hearsay provided in this affidavit. No statement in the affidavit corroborates the honesty of the unknown detective or investigator who saw the alleged contraband images depicted on the website. No federal case law that permits the use of triple or quadruple hearsay in any event.

## Judicial Oversight Role

The affidavit and warrant establish that the signing judge never viewed the alleged contraband images on the alleged illegal website. Given the proximity of a image representing either a felony or the exercise of a constitutional right, it was incumbent upon the signing judge to view at least one or some of the images allegedly found on the home page of that site in question to make an independent determination of its probable cause. The affiant did not even present to the signing judge a recreation of what the site appeared like on the date and time when Mr. Graham allegedly purchased his two subscriptions. In this respect, the signing judge abandoned his judicial role and merely provided a rubber stamp to the following presumptions:

1. The website had contraband images (based upon an anonymous hearsay declarant whose reliability is never established)

2. Mr. Graham purchased a subscription to the site 16 months prior to the issuance of the warrant.

3. Mr. Graham was able to download information from that site.

4. Mr. Graham never did download information from that site. (According to the log files).

5. But, if Mr. Graham downloaded information from that site, he retained that information for those 16 months.

6. That images he may have downloaded, although the evidence the affiant had was that he did not download any such images, were, in fact, contraband and not something that

merely "appears to be" contraband and is constitutionally protected as the court identified in <u>Free Speech Coalition</u>.

7.    The affiant had the ability to know that the information that Graham may have downloaded was not the type that is constitutionally protected as outlined in <u>Free Speech Coalition</u> despite the fact that government digital imaging experts lack the capacity to make that distinction.

<u>CONCLUSION</u>

Wherefore, Mr. Graham respectfully requests this court exclude all evidence seized in connection with the search warrant (Exhibit 1) executed in this case and all statements or other evidence that flowed from the execution of that warrant.

_____/s/_____

Clayton A. Sweeney, Jr.

DE Bar No. 3359
PO Box 55441
Philadelphia PA 19127-5440

(215) 509-1012
(215) 509-1013 (f)
clayt2@verizon.net

**PENDING ADMISSION
PRO HAEC VICE**
Dean Boland 0065693
18123 Sloane Avenue
Lakewood, Ohio 44107
216-529-9371 ph
866-455-1267 fax
dean@deanboland.com

CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that one true and correct copy of the foregoing has been furnished to the Edmund Falgowski, Esquire., U.S. Attorney's Office, 1007 Orange Street, Suite 700 , P.O. Box 2046, Wilmington, DE 19899-2046 by filing through the CF/ECM electronic filing system this 31st day of March, 2008.

/s/
_____

Clayton A. Sweeney, Jr.

U.S. Department of Justice

United States Attorney's Office    DEC 1 2 2007

District of Delaware

Nemours Building
1007 Orange Street, Suite 7100                    (302) 573-6277
P.O. Box 2046                              FAX (302) 573-6220
Wilmington, Delaware 19899-2046

December 11, 2007

**Hand Delivered**

Luis Ortiz, Esquire
Federal Public Defender's Office
First Federal Plaza, Suite 110
704 King Street
Wilmington, Delaware   19801

Re:  **United States v. Phillip Wesley Graham**
     **Criminal Action No. 07-157-SLR**

Dear Mr. Ortiz:

Enclosed please find a copy of the Search Warrant and Search Warrant Application.  Also I enclose a copy of the Criminal Complaint and Affidavit.

By separate letter I will provide you additional papers.

Very truly yours,

COLM F. CONNOLLY
United States Attorney

By:
Edmond Falgowski
Assistant United States Attorney

EF:slb
Enclosures

Exhibit 1

AO 93 (Rev. 5/85) Search Warrant

# United States District Court

### DISTRICT OF ————— DELAWARE

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

1300 Cynwyd Club Apartments,
Apartment 7, Wilmington, Delaware,
described more particularly on
Attachment A

## SEARCH WARRANT

CASE NUMBER: 07–

TO: ___William O. Horn, ICE___ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ___Special Agent William O. Horn___ who has reason to
                                                                    Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

1300 Cynwyd Club Apartments, Apartment 7, Wilmington, Delaware, described more
particularly on Attachment A

in the_____ District of ___Delaware_____ there is now
concealed a certain person or property, namely (describe the person or property)

described in Attachment B

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person
or property so described is now concealed on the person or premises above-described and establish grounds for
the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____
                                                                            Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search (in the daytime — 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find
reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy
of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or prop-
erty seized and promptly return this warrant to _____
                                                                            U.S. Judge or Magistrate
as required by law.

_____           at   Wilmington, Delaware
Date and Time Issued                      City and State

Honorable Leonard P. Stark
United States Magistrate Judge          Exhibit 1
Name and Title of Judicial Officer                   _____
                                                      Signature of Judicial Officer

## **ATTACHMENT A**

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The SUBJECT PREMISES to be searched are more particularly described as an apartment in a
three-story, brick and tan apartment building with white railings on the balconies and stairs.
Apartment 7 is located on the second floor inside the rightmost door of the building with the
numerals "1300" on the outside door, and a metallic numeral "7" on the door to the apartment.

Exhibit 1

## ATTACHMENT B

<u>ITEMS TO BE SEARCHED FOR AND SEIZED</u>

A.  images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

i.  any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

ii.  books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

iii.  originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

iv.  motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

B.  information or correspondence pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

Exhibit 1

i.    envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

ii    books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

C.    credit card and debit card information including but not limited to bills and payment records, including Visa card number 4477 0780 0009 2751;

D.    records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence; and

E.    records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

2

Exhibit 1

# United States District Court

DISTRICT OF __DELAWARE__

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

1300 Cynwyd Club Apartments,
Apartment 7, Wilmington, Delaware,
described more particularly on
Attachment A

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER:  07- _202 M_

I __William O. Horn__ _____ being duly sworn depose and say:

I am a(n) __Immigration and Customs Enforcement Special Agent__ and have reason to believe
<span>Official Title</span>

that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

1300 Cynwyd Club Apartments, Apartment 7, Wilmington, Delaware, described more
particularly on Attachment A

in the _____ District of __Delaware__

there is now concealed a certain person or property, namely (describe the person or property)

described in Attachment B

which is (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence of a crime or contraband

in violation of Title __18__ United States Code, Section(s) __2252__ and __2252A__
The facts to support the issuance of a Search Warrant are as follows:

Affidavit attached.

Continued on the attached sheet and made a part hereof. ☒ Yes ☐ No

Signature of Affiant
William O. Horn, Special Agent
Immigration & Customs Enforcement

Sworn to before me, and subscribed in my presence

__October 22, 2007__                    at    __Wilmington, Delaware__
Date                                            City and State

Honorable Leonard P. Stark                   Exhibit 1
United States Magistrate Judge
Name and Title of Judicial Officer          Signature of Judicial Officer

## ATTACHMENT A

<u>DESCRIPTION OF PROPERTY TO BE SEARCHED</u>

The SUBJECT PREMISES to be searched are more particularly described as an apartment in a three-story, brick and tan apartment building with white railings on the balconies and stairs. Apartment 7 is located on the second floor inside the rightmost door of the building with the numerals "1300" on the outside door, and a metallic numeral "7" on the door to the apartment.

Exhibit 1

## ATTACHMENT B

ITEMS TO BE SEARCHED FOR AND SEIZED

A.  images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

   i.  any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

   ii.  books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

   iii.  originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

   iv.  motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

B.  information or correspondence pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

Exhibit 1

     i.       envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

     ii       books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

C.      credit card and debit card information including but not limited to bills and payment records, including Visa card number 4477 0780 0009 2751;

D.      records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence; and

E.      records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

2

Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


AFFIDAVIT


I, William O. Horn, being duly sworn, depose and state:

1.      I am a Special Agent with the Department of Homeland Security, Immigration and

Customs Enforcement (ICE), assigned to the Resident Agent in Charge in Wilmington,

Delaware. I have been so employed since March 1, 2003. As part of my daily duties as an ICE

agent, I investigate criminal violations relating to child exploitation and child pornography

including violations pertaining to the illegal production, distribution, receipt, and possession of

child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A. I have received training in

the area of child pornography and child exploitation, and have had the opportunity to observe and

review numerous examples of child pornography (as defined in 18 U.S.C. § 2256)[1] in all forms

of media including computer media. I have also participated in the execution of approximately

---

[1] "Child Pornography means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where – (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; . . . [or] (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." For conduct occurring after April 30, 2003, the definition also includes "(B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).

Exhibit 1

ten search warrants, many of which involved child exploitation and/or child pornography offenses.

    2.    This Affidavit is made in support of an application for a warrant to search the entire premises located at 1300 Cynwyd Club Apartments, Apartment 7, Wilmington, Delaware (the "SUBJECT PREMISES"). The SUBJECT PREMISES to be searched are more particularly described as a second-floor apartment in Building 1300 of Cynwyd Club, at Milltown and McKennans Church Roads, in Wilmington, DE. The door to the apartment in question is marked with a metallic "7." The purpose of this application is to seize evidence of violations of 18 U.S.C. §§ 2252(a)(4)(B) and 2252A(a)(5)(B), which make it a crime to possess child pornography, and violations of 18 U.S.C. §§ 2252(a)(2) and 2252A(a)(2), which make it a crime to receive child pornography in interstate commerce by computer.

    3.    I am familiar with the information contained in this Affidavit based upon the investigation I have conducted and based on my conversations with other law enforcement officers who have engaged in numerous investigations involving child pornography.

    4.    Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252A are located at the SUBJECT PREMISES and within a computer and related peripherals, and computer media found at the SUBJECT PREMISES. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

2

Exhibit 1

5.    As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 2252 and 2252A, are present at the SUBJECT PREMISES.

6.    The instant investigation has revealed that an individual named Philip Graham purchased at least two subscription to a website that was distributing child pornography, and that there is probable cause to believe that Philip Graham subscribed to this website using a computer that is located at the SUBJECT PREMISES.

7.    Paragraphs "8" and "9" explain technical terms and concepts related to computers. Paragraphs "10" and "11" explain how computers and computer technology have revolutionized the way in which child pornography is produced, utilized and distributed. The information set forth in paragraphs "13" through "35" provide background concerning an underlying investigation through which the lead to the SUBJECT PREMISES was developed. They also provide a general overview of how subscriptions to a particular website labeling itself "Illegal CP" and offering access to child pornography were linked to individual purchasers including a purchaser that is believed to reside at the SUBJECT PREMISES. Finally, paragraphs "36" through "45" describe, more particularly, the investigation of the SUBJECT PREMISES.

## THE INTERNET AND DEFINITIONS OF TECHNICAL TERMS PERTAINING TO COMPUTERS

8.    As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers[2] and other electronic

---

[2]**Computer:** The term "computer" is defined by 18 U.S.C. § 1030(e)(1) to mean "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or

devices that communicate with each other using various means, including standard telephone

lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless

transmissions including satellite. Due to the structure of the Internet, connections between

computers on the Internet routinely cross state and international borders, even when the

computers communicating with each other are in the same state. Individuals and entities use the

Internet to gain access to a wide variety of information, to send information to, and receive

information from, other individuals, to conduct commercial transactions, and to communicate via

electronic mail ("e-mail"). An individual's access to the Internet is accomplished through a

computer that is linked to the Internet, usually through a commercial service, called an "Internet

Service Provider" or "ISP" (see definition of "Internet Service Provider" below). Once the

individual has accessed the Internet, whether from a residence, a university, or a place of

business, that individual can use Internet mail services, including sending and receiving e-mail.

In addition, the individual can visit commercial Internet websites (see definition of "websites"

below), to purchase a variety of goods and services from those websites.

9. Set forth below are some definitions of technical terms, many of which are used

throughout this Affidavit, and in ATTACHMENTs A and B hereto, pertaining to the Internet and

computers more generally.

   a. **Client/Server Computing:** Computers on the Internet are identified by
      the type of function they perform. A computer that provides resources for

---

communications facility directly related to or operating in conjunction with such device, but such
term does not include an automated typewriter or typesetter, a portable hand held calculator, or
other similar device."

4

Exhibit 1

other computers on the Internet is known as a **server**. Servers are known by the types of service they provide - that is - how they are configured. For example, a **web server** is a computer that is configured to provide web pages to other computers requesting them. An e-mail server is a computer that is configured to send and receive electronic mail from other computers on the Internet. A **client computer** is a computer on the Internet that is configured to request information from a server. If a client computer is configured to browse web pages and has web page browsing software installed, it is considered a **web client**.

b. **Computer system and related peripherals, and computer media:** As used in this affidavit, the terms "computer system and related peripherals, and computer media" refer to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, Graphic Interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats, including, but not limited to, JPG, GIF, TIF, AVI, and MPEG.

c. **Domain Name:** Domain names are common, easy to remember names associated with an Internet Protocol address (defined below). For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first level, or top-level domains are typically .com for commercial organizations, .gov for the United States government, .org for organizations, and, .edu for educational organizations. Second level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the world wide web server located at the United States Department of Justice, which is part of the United States government.

d. **Internet Service Providers (ISPs) and the Storage of ISP Records:** Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of services for their customers including access to the

5

Exhibit 1

Internet, web hosting, e-mail, remote storage, and co-location of computers (defined below) and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password. ISPs maintain records (**"ISP records"**) pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory or mailbox. Such temporary, incidental storage is defined by statute as **"electronic storage,"** see 18 U.S.C. § 2510(17), and the provider of such a service is an **"electronic communications service."** An "electronic communications service," as defined by statute, is "any service which provides to users thereof the ability to send or receive wire or electronic communications. 18 U.S.C. § 2510(15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a **"remote computing service."** 18 U.S.C. § 2711(2).

e.  **Internet Protocol (IP) Address:** Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number

6

Exhibit 1

between 0 and 254. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISP's employ **dynamic IP** addressing - that is - they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A **dynamic IP address** is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial-up session. Once the session ends, the IP address is available for the next dial-up customer. On the other hand, some ISP's, including some cable providers, employ **static IP** addressing - that is, a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a **static IP address** is an IP address that does not change over a period of time and is typically assigned to a specific computer.

f.  **Log File:** Log files are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

g.  **Modem:** A modem is an electronic device that allows one computer to communicate with another and facilitates access to the Internet.

h.  **Trace Route:** A trace route is an Internet debugging tool used to document the list of inter-connected computers between two computers on the Internet. A trace route will list the names and IP addresses of computers that provide the physical link between two computers on the Internet. Trace routes are useful tools to help geographically identify where a computer on the Internet is physically located, and usually includes information about the registered owner of computers on the Internet.

7

Exhibit 1

i. **Universal Resource Locator (URL):** A URL is the unique address for a
file that is accessible on the Internet. For example, a common way to get
to a website is to enter the URL of the website's home page file in the
Web's browser address line. Additionally, any file within that website can
be specified with a URL. The URL contains the name of the protocol to
be used to access the file resource, a domain name that identifies the
specific computer on the Internet, and a pathname, a hierarchical
description that specifies the location of a file in that computer.

j. **Website:** A website consists of textual pages of information and
associated graphic images. The textual information is stored in a specific
format known as Hyper-Text Mark-up Language (HTML) and is
transmitted from the web servers to various web clients via Hyper-Text
Transport Protocol (HTTP).

k. **Website Hosting:** Website hosting provides the equipment and services
required to host and maintain files for one or more websites and to provide
rapid Internet connections to those websites. Most hosting is "shared,"
which means that multiple websites of unrelated companies are on the
same server in order to reduce associated costs. When a client develops a
website, the client needs a server and perhaps a web hosting company to
host it. **"Dedicated hosting"** means that the web hosting company
provides all of the equipment and assumes all of the responsibility for
technical support and maintenance of a website. **"Co-location"** means a
server is located at a dedicated hosting facility designed with special
resources, such as a secure cage, regulated power, climate control, a
dedicated Internet connection, online security and online technical support.
Co-location facilities offer customers a secure place to physically house
their hardware and equipment as opposed to keeping it in their offices or
warehouse, where the potential for fire, theft, or vandalism is greater.

## COMPUTERS AND CHILD PORNOGRAPHY

10.    Based upon my knowledge, training, and experience in child exploitation and

child pornography investigations, and the experience and training of other law enforcement

officers with whom I have had discussions, I know that computers and computer technology have

revolutionized the way in which child pornography is produced, distributed, and utilized. Prior

to the advent of computers and the Internet, child pornography was produced using cameras and

8

Exhibit 1

film, resulting in either still photographs or movies. The photographs required darkroom

facilities and a significant amount of skill in order to develop and reproduce the images. As a

result, there were definable costs involved with the production of images. To distribute these

images on any scale also required significant resources. The photographs themselves were

somewhat bulky and required secure storage to prevent their exposure to the public. The

distribution of these wares was accomplished through a combination of personal contacts,

mailings, and telephone calls, and compensation for these wares would follow the same paths.

More recently, through the use of computers and the Internet, distributors of child pornography

use membership and subscription-based websites to conduct business, allowing them to remain

relatively anonymous.

      11.    In addition, based upon my own knowledge, training, and experience in child

exploitation and child pornography investigations, and the experience and training of other law

enforcement officers with whom I have had discussions, I know that the development of

computers has also revolutionized the way in which those who seek out child pornography are

able to obtain this material. Computers serve four basic functions in connection with child

pornography: production, communication, distribution, and storage. More specifically, the

development of computers has changed the methods used by those who seek to obtain access to

child pornography in these ways:

>     a.    Producers of child pornography can now produce both still
> and moving images directly from a common video or digital
> camera. The camera is attached, using a device such as a cable, or
> digital images are often uploaded from the camera's memory card,
> directly to the computer. Images can then be stored, manipulated,
> transferred, or printed directly from the computer. Images can be
> edited in ways similar to how a photograph may be altered. Images

9

Exhibit 1

can be lightened, darkened, cropped, or otherwise manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b.      The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial ISPs, such as America Online ("AOL") and Microsoft, which allow subscribers to dial a local number or otherwise directly connect to a network, which is, in turn, connected to the host systems. Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

c.      The Internet allows users, while still maintaining anonymity, to easily locate (a) other individuals with similar interests in child pornography and (b) websites that offer images of child pornography. Those who seek to obtain images or videos of child pornography can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute or receive child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions involving those who wish to gain access to child pornography over the Internet. Sometimes, the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache[3]

---

[3] "Cache" refers to text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to

to look for "footprints" of the websites and images accessed by the recipient.

d.     The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy or compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 250 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

12.     Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily-available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via

and interaction with that website.

11

Exhibit 1

the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## OVERVIEW OF THE NEW JERSEY INVESTIGATION

13.    The information set forth below is provided as a broad overview of the investigation conducted to date. It does not include a listing of all investigative techniques employed or even the full and complete results of any of the listed investigative efforts.

14.    The United States Attorney's Office for the District of New Jersey ("USAO DNJ"), and the New Jersey offices of ICE have conducted an investigation (the "New Jersey Investigation") of a commercial website labeling itself "Illegal.CP" (hereinafter the "Illegal CP" website)[4] which offers access to thousands of images and videos of child pornography via subscriptions of 20 and 30 days' duration. The investigation has revealed that the owners and operators of the "Illegal CP" website have conspired with other corporate entities and individuals, including the operators of a company known as "AD-SOFT" to commercially distribute child pornography.

## INVESTIGATION OF THE "ILLEGAL CP" WEBSITE

---

[4] The term "CP" is an abbreviation commonly used on the Internet to denote "child pornography."

12

Exhibit 1

## I.     Initial Phase - Operation Emissary

15.     In or about October 2005, agents with ICE located a website known as the "Illegal CP" website at a URL of http://hualama.cjb.net/, accessible via the Internet at that time through another web page located at a URL of http://deadundead.info/main.html, which was accessible via the Internet, including from New Jersey. The banner page of the website -- that is, the page which initially appeared and which did not require the person accessing the website to provide any financial or personal information -- labeled itself "illegal.CP," and featured more than one dozen images of minors engaging in sexual acts with other minors or adults.[5] The banner page further proclaimed that "[n]ow you are in [sic] few minutes away from the best children porn site on the net!" The banner page further stated that "[i]f you join this site you will get tons of uncensored forbidden pics (over 5 at this moment), forbidden stories, and, of course, many videos." The banner page also featured purported feedback from a self-described pedophile who praised the website. The words "join now" appeared at the top and bottom of the page.[6]

---

[5] The banner page was actually part of the "deadundead" web page on October 26, 2005. This banner page, through which ICE agents obtained a subscription to the "Illegal CP" website, was captured and preserved by agents. Once a user clicked upon the "Join Now" button, a page requesting personal and credit card information appeared. This page was also technically part of the "deadundead" website. After entering the requested financial information, the user would receive e-mail confirmation of the purchase as well as a login and password to access the "Illegal CP" website.

[6] The content of the banner page itself was not located on the server containing the contents of the "Illegal CP" website, which was maintained during October and November 2005 on a server located in Orlando, Florida, but on another server located in California.

13

Exhibit 1

16. On or about October 26, 2005, an ICE agent, acting in an undercover capacity, (hereinafter UC-1) purchased access to the "Illegal CP" website after accessing this banner page. In response to UC-1's efforts to purchase a subscription to the website, an e-mail from theodore dykstra@hotmail.com was received on October 27, 2005 at the undercover e-mail address established by ICE agents. That e-mail provided UC-1 with a login and a password to a URL of http://hualama.cjb.net/. The e-mail message also indicated that the credit card charges would appear on UC-1's credit card bill as "ADSOFT" and would include a charge for $79.99.

17. Upon entering the login and password provided via the e-mail from theodore dykstra@hotmail.com, UC-1 was able to gain access to the "Illegal CP" website. The login and password block stated that UC-1 was being connected to the IP address of "72.29.83.114." Upon accessing the website, a URL of http://hualama.cjb.net appeared. The top of the initial page that appeared upon entry into the website stated as follows:

> FAQ, Please read. "Our site is considered to be illegal in all countries.... Even if you ever have problems with police, you can always say that someone had stolen the information from your credit card and used it. It is very difficult to establish that you were the person to pay."

18. Upon examination of the contents of the website, ICE agents determined that it contained thousands of images of child pornography. Upon placing the cursor over a particular image, a URL was listed at the bottom of the screen of "72.29.83.114/~medialo/1/index.html." The website contained both still images and videos of child pornography, and offered the purchase of additional videos through the website. For example, three of the still images of child pornography found on the "Illegal CP" website are described as follows:

14

Exhibit 1

a. http://72.29.83.114/~medialo/1/pics/300/0013.jpg: This image depicts a nude, adult male sitting upon a floor with his legs spread wide apart. A nude, prepubescent female is also depicted, and she is lying on her back with her legs spread apart. The left hand of the male is holding the female's right leg. His erect penis appears to be penetrating the prepubescent female's vagina.

b. http://72.29.83.114/~medialo/1/pics.300/0022.jpg: This image depicts a nude prepubescent female in a standing position. She is facing an adult male who also appears to be standing. The male is wearing what appears to be a dark-colored robe, but his genital area is exposed. The prepubescent female has her left hand wrapped around the male's penis and appears to be performing fellatio upon him.

c. http://72.29.83.114/~medialo/1/pics/300/0073.jpg: This image depicts what appears to be an adult male wearing a white shirt who is nude below the waist. He appears to be lying upon a bed with red pillows. A nude, prepubescent female is sitting upon the bed next to the male. Her legs are bent so that her buttocks rests on her feet. Her right hand is holding the male's penis.

19.     Through the use of a commercially available search tool, law enforcement agents were able to determine that the IP address listed for the "Illegal CP" website – 72.29.83.114 – was associated with a server based in Orlando, Florida, which hosted the content of the "Illegal CP" website during October and November 2005. The search tool revealed that the server is owned by HostDime.com, Inc., 111 N. Orange Avenue, Suite 1050, Orlando, Florida. This information was verified on or about November 14, 2005, and a representative of HostDime.com confirmed that it was in possession of the server in question on or about November 16, 2005.

20.     A search of the server on which the contents of the "Illegal CP" website were maintained was performed on or about November 17, 2005 pursuant to a court-authorized search warrant. A review of the contents of this server revealed the presence of thousands of images and videos of child pornography. Further, a review of the contents of the server revealed the IP

15

Exhibit 1

address for all contacts with the content maintained on the server (the "Illegal CP" website) that

had occurred from on or about November 9, 2005 through on or about November 17, 2005.

Specifically, this data revealed that hundreds of IP addresses presumably associated with

individual subscribers had visited the "Illegal CP" website during this nine-day period. The data

also demonstrated which individual images had been accessed by each IP address. On or about

December 14, 2005 and January 5, 2006, two additional search warrants were executed on the

HostDime server on which the contents of the "Illegal CP" website were hosted through

December 2005. Both searches produced additional log files documenting contacts from specific

IP addresses with particular images contained on the "Illegal CP" website. During November

and December 2005, it is believed that the operators of the "Illegal CP" website shifted the

location of the contents of the "Illegal CP" website to a different server and began phasing out

the use of the HostDime.com server.

21.     On or about December 23, 2005, the Honorable William J. Martini, United States

District Judge for the District of New Jersey, signed an order authorizing the interception of

electronic communications occurring over the e-mail account of theodore dykstra@hotmail.com

(hereinafter the "Dykstra Hotmail Account"). Actual interception pursuant to that order

commenced on December 27, 2005. Over the following thirty day period, numerous pertinent e-

mail communications were intercepted pertaining to individuals attempting to gain access to the

"Illegal CP" website. Based on those interceptions, ICE agents have been able to determine the

following:

> i.   The individual or individuals controlling the Dykstra Hotmail Account
>      receives the information submitted by an individual attempting to
>      subscribe to the "Illegal CP" website by some means or pathway other

Exhibit 1

than the Dykstra Hotmail Account. That information includes the name of
the subscriber, the subscriber's address, the subscriber's credit card
information and the subscriber's e-mail address.

ii. The individual or individuals controlling the Dykstra Hotmail Account
then transmit this information via an attachment to an e-mail to one of the
following e-mail addresses: joe777@mail.ru, admin@sib-games.com and
admin@ad-soft.net. The Dykstra Hotmail Account then receives a return
e-mail, typically on the same day, from one of the previously referenced e-
mail accounts (joe777@mail.ru, admin@sib-games.com or admin@ad-
soft.net) which effectively advises whether the individual should be
accepted or rejected as a subscriber or whether some other action should
be taken. Typically, those who are to be granted access to the "Illegal CP"
website will have their e-mail address listed in this second e-mail,
followed by the phrase "term," which is followed by four to five digits,
e.g., "term12345."[7]

---

[7] Some individuals who attempt to subscribe have their credit card information reviewed
by the operators of these e-mail accounts only to have these operators return their information to
the operator(s) of the Dykstra Hotmail Account with a notation of "egold," which is a form of
electronic payment. It is believed that many of these individuals have previously subscribed to
the "Illegal CP" website and that the operators of the "Illegal CP" website often require repeat
subscribers to use this alternate form of payment, most likely because it is more difficult to track.
The operators of the "Illegal CP" website offer a new subscriber who uses a credit card a
subscription of 20 days' duration at a price of $79.99. Those who pay through e-gold are
typically offered a subscription of 30 days' duration at a typical price of $40.00.

17

Exhibit 1

iii. Finally, an e-mail from the Dykstra Hotmail Account is sent to the individuals whose credit card information has been satisfactorily verified (a) informing them that they have been granted access to the "Illegal CP" website; (b) providing a password and login (typically those which have been previously selected by the would-be subscriber); and (c) supplying at least one link to the "Illegal CP" website. Accordingly, the interception of electronic communications over the Dykstra Hotmail Account provided direct evidence of those individuals who had successfully subscribed to the "Illegal CP" website.[8]

iv. In instances when the operator or operators of the Dykstra Hotmail Account desired that a would-be subscriber gain access to the "Illegal CP" website via E-Gold, an e-mail would be sent to that individual providing a link where the individual could access instructions for making payment through E-Gold. For those who were already able to make a payment through E-Gold, the e-mail listed one of two E-Gold accounts controlled by the operator or operators of the Dykstra Hotmail Account through which a subscriber could make a direct payment.

22.     Interception of electronic communications over the Dykstra Hotmail Account

ended pursuant to the December 23, 2005 order on January 25, 2006. Pursuant to an order signed

by the Honorable William J. Martini authorizing continued interception of electronic

communications over the Dykstra Hotmail Account, interception resumed on or about

---

[8] Agents have discovered that the e-mail message notifying individual subscribers that they had been granted access to the "Illegal CP" website and would be billed by ADSOFT was not always sent via the Dykstra Hotmail Account. Agents have determined this by, among other things, execution of a search warrant relating to another e-mail account associated with the "Illegal CP" website which revealed the presence of similar messages which were not captured by the interception of electronic communications over the Dykstra Hotmail Account or via a trap and trace device relating to that account.

18

Exhibit 1

January 27, 2006 and continued through February 25, 2006. During this time period, hundreds of individuals within the United States were granted access to the "Illegal CP" website.

23. During the period of authorized interception, ICE agents determined that the operator(s) of the "Illegal CP" website had shifted the contents of the website to another server located in McLean, Virginia which began hosting the content of the website as early as December 2005. On or about February 1, 2006, a search of a server maintained by an ISP known as HopOne[9] was conducted pursuant to a court-authorized search warrant. That search revealed the presence of thousands of images and videos of child pornography from the "Illegal CP" website contained on the server. In addition, numerous log files ranging from the period from October of 2005 through February 1, 2006 were recovered which documented contact by numerous IP addresses. These log files also included a variety of data of individuals who were members of the "Illegal CP" website, comprising a member's ID, a member's login, the member's e-mail address, the date and time when the member's subscription began and the IP address. For each particular video or image which had been accessed by a member, the log files provided the member's ID, the IP address of the individual accessing the particular image and the date and time when that particular image had been accessed. A second court-authorized search warrant was obtained for this server on or about March 2, 2006 which provided log file information from February 1, 2006 through February 7, 2006, at which time the ISP shut down the website. The website was subsequently established on a third server after a disruption in access to the website which lasted several days, and which resulted in the operators of the "Illegal

---

[9] Agents have uncovered no evidence to suggest that the operators of HostDime.com or HopOne were aware that their servers were being used to host a website offering access to child

Exhibit 1

CP" website offering free access to archives of child pornography associated with the website to

its inconvenienced subscribers.[10]

24.    As a result of the data gathered through the searches of the HostDime and

HopOne servers, as well as the information retrieved by virtue of the orders authorizing the

---

pornography.

[10] From the time when ICE agents originally purchased access to the "Illegal CP" website in October of 2005 through the end of the period of authorized interception over the Dykstra Hotmail Account in late February 2006, the design of the banner page of the "Illegal CP" website changed on numerous occasions - typically with new images of child pornography being added or subtracted from the page. However, the page always labeled itself "illegal.CP" and always featured images of child pornography on each of the more than 100 occasions during this four-month period when ICE agents visited the website. Agents also determined that other join pages were placed on the Internet through which a would-be subscriber could submit information for the purpose of gaining access to the "Illegal CP" website. Agents encountered and preserved two other join pages through which many of the subscribers gained access. One labeled itself "The Sick Child Room," and described its contents as featuring "the ultimate in child porn video." The other was entitled the "Children Porno Portal," and described itself as the "Kids Porn Archive." On every occasion when agents were able to locate and preserve these join pages, the pages used one of these labels and featured graphic images of child pornography, although the images might be changed over time.

20

Exhibit 1

interception of electronic communications occurring over the Dykstra Hotmail Account, ICE agents were able to identify hundreds of individuals in the United States who had successfully subscribed to the "Illegal CP" website during the period from November 2005 through February 25, 2006. In June 2006, these leads were distributed to various ICE offices throughout the United States as part of what became known as "Operation Emissary." During the period from July 2006 through November 2006, more than 230 search warrants were executed for the purpose of seizing the computers and related peripherals of individual subscribers to the "Illegal CP" website. As of December 2006, more than 150 individuals who had subscribed or attempted to subscribe to the "Illegal CP" website between November 2005 and February 2006 had been arrested for possessing and/or receiving child pornography. In addition, more than 90 percent of the individuals whose computers were seized pursuant to a court-authorized search warrant were found to be in possession of child pornography and/or admitted to purchasing access to child pornography websites. In New Jersey, for example, approximately 14 search warrants were executed as of October 2006 pursuant to the leads generated through the investigation. The execution of these 14 search warrants led to the recovery of child pornography and/or admissions from the targets in all 14 cases.

## II.    The Second Phase of the "Operation Emissary" Investigation

25.    With the distribution of the leads to ICE offices across the United States, investigators in the District of New Jersey began to focus upon the flow of the money generated by the credit card purchases of individual subscribers for access to the "Illegal CP" website. The financial investigation has in turn led to the identification of hundreds of additional subscribers to the "Illegal CP" website during the period from late February 2006 through mid-July 2006.

21

Exhibit 1

26.     During the course of the investigation into the "Illegal CP" website and several

other commercial websites offering access to images and videos of hard-core child pornography,

ICE agents were able, through the use of numerous investigative techniques, to identify three

merchants, including ADSOFT, which were involved in the laundering of funds generated by

individual on-line credit card subscriptions to these child pornography websites. ICE agents

further determined that all of these merchants were associated with another merchant known as

Forcetronix which had authorization to process on-line credit card transactions for its website

clients through an Acquiring Bank[11] located in the Philippines, known as the Rizal Bank, and

Rizal Bank's associated entity, Bankard (referred to collectively hereinafter as "Rizal

Bank/Bankard"). Agents further learned that a company known as CNP Worldwide, Inc.

(hereinafter "CNP Worldwide" or "CNP") - an Independent Sales Organization[12] (ISO) - had

been responsible for bringing Forcetronix to the Rizal Bank/Bankard, after which Forcetronix

and its various clients - including ADSOFT - began having on-line credit card transactions

---

[11] A Merchant who wishes to sell goods or services over the Internet will require the
individual purchaser to provide basic information, i.e., name, address, credit card information,
etc., to the Merchant through the Merchant's website. After the Merchant receives the
purchaser's information, the Merchant provides this data to the bank with which it has a financial
relationship (the "Acquiring Bank"). The Merchant has ordinarily entered into a contractual
arrangement with the Acquiring Bank whereby the Acquiring Bank agrees to process the credit
card transactions of the Merchant for a fee or a percentage of each transaction. The Acquiring
Bank then typically provides this data to the credit card company, i.e., MasterCard or Visa, to
determine the identity of the bank which issued the credit card to the consumer (the "Issuing
Bank").

[12] The on-line credit card transaction process may also involve Independent Sales
Organizations ("ISOs") whose primary function is to locate a merchant account with an
Acquiring Bank on behalf of its Merchant clients so that the Merchant clients will be able to
consummate on-line credit card sales. The ISO may have a portfolio of Merchant clients on
whose behalf it locates an Acquiring Bank with the capacity to process on-line credit card
transactions in exchange for which the ISO receives a fee.

22

Exhibit 1

processed through Rizal Bank/Bankard. During the course of this investigation, ICE agents have learned a substantial amount about the history of the relationship between CNP, Forcetronix, Bankard and the Rizal Bank as well as a third-party processor known as Transactional Technologies, d/b/a "JetPay" (hereinafter "JetPay"). In particular, agents have learned how these entities managed to process hundreds of thousands of dollars' worth of credit card transactions during 2006, relating to the purchase of access to child pornography through at least three commercial websites offering access to child pornography. The history of these companies' relationships are described in further detail directly below.

### A.  The Relationship Between Rizal Bank & Bankard

27.    Several years ago, MasterCard and Visa licensed the Rizal Bank in the Philippines to process credit card transactions on behalf of merchants (as well as to issue MasterCard credit cards). The Rizal Bank, in turn, had a close contractual relationship with a company known as Bankard, which served as the "acquiring arm" for Rizal Bank.[13]  Initially, Rizal Bank/Bankard processed only credit card transactions that involved what is known as "card present" situations, i.e., where the credit card was physically presented to the Merchant during the transaction. An example of a "card present" transaction is one where a customer pays for a meal at a restaurant with a credit card. Thus, initially Rizal Bank/Bankard did not process on-line credit card transactions.

### B.  CNP Worldwide and Rizal Bank/Bankard's Relationship Begins

---

[13] Although Rizal Bank and Bankard are technically separate entities, they work closely in tandem, with Bankard operating the credit card transaction business on behalf of Rizal Bank which is believed to be a partial owner of Bankard. Bankard's primary function was to receive or "acquire" the credit cards from merchants who were already authorized to process credit card

23

Exhibit 1

28.    The credit card transaction business of Rizal Bank/Bankard fundamentally changed when they entered into a relationship with CNP, a company which specialized in on-line credit card transactions.[14] The primary function of CNP - an ISO - is to locate Acquiring Banks which will process on-line credit card transactions for CNP's portfolio of clients. Shortly after its formation, CNP located Bankard in the Philippines, and sought Bankard's assistance in processing credit card transactions for CNP's on-line clients.

29.    With the joining of Rizal Bank/Bankard and CNP, Rizal Bank/Bankard began to process a far greater volume of credit card transactions. One of CNP's clients, which began processing transactions through Rizal Bank/Bankard, is the aforementioned Forcetronix, which was introduced to Rizal Bank/Bankard through its relationship with CNP. Forcetronix was thereafter able to have the online credit card transactions of its clients - most notably, ADSOFT - processed through Rizal Bank/Bankard.

**C. JetPay Joins the Transactional Chain on Behalf of Forcetronix**

transactions through the Acquiring Bank, i.e., Rizal Bank.

[14] CNP is an acronym which stands for "Card Not Present."

24

Exhibit 1

30.     In addition to arranging for Rizal Bank/Bankard to process on-line credit card transactions for its clients, such as Forcetronix, it further appears that CNP helped arrange for all of Forcetronix's transactions to be processed through JetPay, a company based in Carrollton, Texas. JetPay is a third party processor. As a third party processor, JetPay receives the datastream input by individual customers seeking to purchase goods or services from an Internet merchant, and verifies that all of the necessary data to complete a transaction has been included before forwarding the relevant data to the appropriate credit card company. When JetPay initially sought authority to process MasterCard transactions, it submitted to MasterCard a Third Party Processor application in which it represented that included among its services would be processing authorizations, fraud control and electronic data capture. Representatives of MasterCard have confirmed that JetPay has acted as the third party processor for all transactions involving the clients of Forcetronix which have been identified by ICE agents as processing child pornography, including ADSOFT and other entities, prior to forwarding that data to MasterCard.[15]

## D.   Summary of On-Line Transactions Involving ADSOFT

---

[15] There is no evidence to suggest that JetPay, Alta Vista, MasterCard or Visa were aware of the true nature of the ADSOFT transactions.

25

Exhibit 1

31.    Accordingly, ICE agents have determined the basic flow of on-line credit card

transactions for the purchase of access to the "Illegal CP" website during the first half of 2006.

First, the merchant Forcetronix – and, by extension, its merchant clients including ADSOFT -

had a contractual relationship with an Acquiring Bank - Rizal Bank/Bankard - through which

they were enabled to process their on-line credit card transactions.  When an individual customer

attempted to purchase access to the "Illegal CP" website, the data which he input was forwarded

to JetPay, the third party processor.  After JetPay verified that the datastream was complete, i.e.,

all necessary information had been included, JetPay forwarded the relevant data, including the

credit card number and expiration date, to the appropriate credit card company, such as

MasterCard or Visa.[16]  The credit card company then determined which Issuing Bank had issued

the credit card to the individual consumer, and forwarded the proposed transaction information to

the Issuing Bank.  After the customer's Issuing Bank had determined whether the transaction

should be approved or denied, i.e., whether the card was stolen, whether there were sufficient

funds in the account, etc., the transaction essentially went in reverse order, with the Merchant, i.e.

ADSOFT, ultimately being notified whether the customer should be granted access to the "Illegal

CP" website.  ADSOFT then received payment in the amount of the subscription price, which

was forwarded from the Acquiring Bank, i.e. Rizal Bank/Bankard, while the customer's Issuing

Bank sent the customer his monthly credit card bill reflecting a charge to the customer from

ADSOFT in the amount of the subscription.  Thus, for example, if a customer purchased a 20-

day subscription to the child pornography website billed under the name  "ADSOFT," he should

---

[16] Credit card numbers are coded such that a particular digit indicates whether the card is
a Visa, MasterCard, American Express or other card.

26

Exhibit 1

have ultimately received a credit card bill with a charge to ADSOFT in the amount of $79.99.

Meanwhile, the operators of the ADSOFT website (or, more likely, the operators of the child

pornography website using the ADSOFT website as a cover)[17] received a payment in the amount

of $79.99 minus any fees that they paid to Forcetronix and/or CNP as well as fees that were owed

to the Rizal Bank/Bankard for processing the transaction.

    32.    On or about September 19, 2006, ICE agents executed a Court-authorized

---

[17] To help disguise the true nature of the financial transactions that were being billed under the name ADSOFT, a website was created for ADSOFT purportedly offering software for purchase. ICE agents in Newark made multiple attempts to purchase legitimate products being offered through the ADSOFT website. That website offered what is called "RegFreeze spyware" for $79.99, the same amount which a credit card purchase of a 20-day subscription to the "Illegal CP" website costs. On March 16, 2006, March 23, 2006 and April 9, 2006, ICE agents acting in an undercover capacity visited the ADSOFT website. Upon clicking the "Buy Now" button, agents were brought to a webpage that could not be displayed. Thus, it appears that the link to the "buy now" button had been disabled, and that the ADSOFT website served merely to create the appearance that ADSOFT was a legitimate company.

Exhibit 1

search warrant signed the previous day by the Honorable William F. Sanderson, Jr., United States

Magistrate Judge, at the facilities of JetPay in Carrollton, Texas. Pursuant to that search warrant,

ICE agents retrieved all data from JetPay's system relating to credit card purchases to ADSOFT

which were maintained on JetPay's computers. Upon review of this material, ICE agents

determined that the information seized included a database of all attempted purchases which had

been authorized and billed to ADSOFT during the period from approximately February 1, 2006

through mid-July 2006. The data included the following items: the credit card number used to

make the purchase and whether it was a Visa or MasterCard, the date and time at which the

purchase was processed, the name that the individual submitting the information had provided to

secure the purchase, and the address of the purchaser to include street address, city or town, zip

code and country. The data also included the name of the company under which the purchase

would be billed (ADSOFT), the amount of the purchase ("79.9[9]") and the word "term"

followed by a five-digit number. This last item mirrored what had been observed during the

period of authorized interception over the Dykstra Hotmail Account when an e-mail would be

sent to the operators of the Dykstra Hotmail Account effectively indicating whether the

individual's attempt to subscribe to the website should be accepted or not, i.e., whether the

transaction had been authorized. For those subscribers whose attempted credit card purchase was

to be accepted, the phrase "term" followed by a four- and then, subsequently, a five-digit number

would be listed. Thus, the database retrieved through the search warrant conducted at JetPay

appears to consist almost entirely of those individuals whose attempted purchase was authorized

and who would have been subsequently granted or offered access to the "Illegal CP" website.[18]

---

[18] In fact, a review of the data obtained via the interception of electronic communications

Exhibit 1

33.    Because the time period for the database retrieved from JetPay overlaps with the period of authorized interception over the Dykstra Hotmail Account, it is possible to corroborate that the data contained on the JetPay database does in fact represent individuals who had been granted access to the "Illegal CP" website. In other words, individuals whose "ADSOFT" purchase is listed as "authorized" on the JetPay database for early February 2006 should also have been captured through the interception of electronic communications over the Dykstra Hotmail Account which concluded on February 25, 2006. A review of the New Jersey subscribers verifies this correlation.[19] Moreover, a review of the more than 200 individuals from the United States listed on the JetPay database whose credit card purchase to ADSOFT was authorized between February 1, 2006 and February 25, 2006 reveals that every one of these individuals was intercepted via the wiretap of the Dykstra Hotmail Account, thus conclusively

---

occurring over the Dykstra Hotmail Account shows that the vast majority of would-be subscribers who were not granted or offered access to the "Illegal CP" website, i.e. those individuals whose e-mail addresses were not followed by the phrase "term" followed by a four or five digit number as described in paragraph 21ii, or referred to e-gold for payment, do not appear on the database obtained from the search at JetPay.

[19] While there are only two New Jersey targets who were granted access to the "Illegal CP" website during the overlapping period, there are dozens of other examples within the United States for which this comparison also holds true.

29

Exhibit 1

demonstrating that a purchase billed to "ADSOFT" was solely for access to the "Illegal CP" website.

34.    For example, e-mails intercepted through the wiretap of the Dykstra Hotmail Account reflected that two individuals from New Jersey, one from Hoboken and one from Verona, had been granted access to the "Illegal CP" website during February 2006. An intercepted e-mail from on or about February 11, 2006 reflected that the individual from Hoboken, with the initials "G.P.," listed an address of 518 Monroe Street and used a credit card with a number ending in the numerals "3478." A subsequent e-mail listed G.P.'s e-mail address followed by the phrase "term22893." A third e-mail from on or about February 12, 2006, from the operators of the Dykstra Hotmail Account, informed G.P. that he had been granted access to the "Illegal CP" website and provided him with three links to that site. A search warrant was executed on G.P.'s residence in early May 2006, and numerous images of child pornography were found on his computer. A review of the JetPay database retrieved in September 2006 documents this purchase. Specifically, that data reflected the processing of a MasterCard with the same credit card number which ended with the numbers "3478" on or about February 11, 2006. The JetPay database further listed the individual attempting to subscribe as "G.P." and listed his address as 518 Monroe Street in Hoboken, with a zip code of [0]7030.[20] The price of the purchase was listed as "$79.9[9]" and the phrase "term22893" was listed as was the name "ADSOFT." The purchase by the subscriber in Verona, New Jersey likewise mirrors the data intercepted over the Dykstra Hotmail Account. Intercepted e-mails over the Dykstra Hotmail

---

[20] On the database obtained from JetPay, the "0" at the beginning of any zip code drops out.

Exhibit 1

Account documented that an individual with the initials "S.L." with an address of 118 Linden

Avenue in Verona used a credit card which ended with the numerals "0256" when attempting to

subscribe to the "Illegal CP" website on or about February 12, 2006. A subsequent e-mail

indicated that this credit card had been authorized and that his attempt to subscribe should be

accepted by virtue of the phrase "term23272" which followed S.L.'s e-mail address. On

February 13, 2006, an e-mail was sent by the operators of the Dykstra Hotmail Account to S.L.'s

e-mail address informing him that he had been granted access to the "Illegal CP" website. A

search of S.L.'s residence on or about July 7, 2006 led to the recovery of hundreds of images of

child pornography on his computer. The database recovered from the search of JetPay likewise

documented this purchase, listing the same Visa credit card with a number ending in the

numerals "0256" as having been processed on or about February 13, 2006. The individual listed

for this transaction was "S.L." with an address of 118 Linden Avenue in Verona. The phrase

"term23272" also appeared along with the word "ADSOFT."[21]

---

[21] In addition, one individual purportedly from New Jersey attempted to subscribe to the
"Illegal CP" website during the overlapping period but was not granted access. Subsequent
investigation revealed that the individual whose credit card had been used for this attempted
subscription had been denied access to the website. This individual does not appear on the
JetPay database, further demonstrating that this database is constituted almost exclusively of the
names and credit card information of those who were granted or offered access to the "Illegal
CP" website.

31

Exhibit 1

35. During the course of the investigation, ICE agents were also able to pinpoint a server through which data flowed when a customer attempted to subscribe to the "Illegal CP" website. On or about March 14, 2006, computer forensic agents in the ICE office in Newark, New Jersey performed an analysis of the join page of the "Illegal CP" website, namely, the page located at a URL of http:deadundead.info/join/html. Using commercially available software, ICE agents determined that the personal and credit card information entered on the form provided by clicking the "Submit" button on the join page of the "Illegal CP" website was transmitted to another website located at a URL of http://pringless.com (hereinafter the "Illegal CP" subscription website). Through the use of a commercially available search tool, agents determined that the "Illegal CP" subscription website was located at AltaVista Company in Sunnyvale, California, and this information was subsequently verified in early April 2006. A search of the server on which the data from the "Illegal CP" subscription website was maintained was performed on or about May 4, 2006 pursuant to a court-authorized search warrant. A review of the contents of this server revealed that certain data that had been input by many would-be subscribers to the "Illegal CP" website had been preserved, including the date and time they had attempted to subscribe, the e-mail address which they had supplied and the physical address which they had listed, including street address, state, country and zip code. By cross-referencing this data with the data from the JetPay server, agents were able to determine the e-mail address used by many individuals who successfully subscribed during the period from February 2006 through the very beginning of May 2006.

## B. Probable Cause to Search the Subject Premises

32

Exhibit 1

36.     ICE agents have determined that an individual named Philip Graham, who currently resides at the SUBJECT PREMISES, has subscribed to the "Illegal CP" website and has received access to child pornography. For the reasons set forth below, there is probable cause to believe that evidence of the receipt and possession of child pornography will be located at the SUBJECT PREMISES.

37.     In or about October and November 2006, ICE agents reviewed the data recovered by virtue of the search warrant conducted at JetPay in September of 2006. That data indicated that an individual with the name Philip Graham successfully purchased access to the "Illegal CP" website on or about May 23, 2006 and June 16, 2006. Furthermore, that data reflected that Philip Graham used a Visa debit card with the number 4477 0780 0009 2751 to make the purchase to the "Illegal CP" website on both dates. An address of 1300 Cynwyd Club Drive, in Wilmington, Delaware, with a zip code of 19808, was listed by Philip Graham when making the purchase. The term "ADSOFT" was listed, as were the phrases "term36612" and "term38055," reflecting that the purchases had been authorized. The data also listed the purchase price as "79.9[9]."

38.     On or about August 31, 2007, ICE agents received the subpoenaed debit card billing records of Philip Graham from Artisans' Bank. Those records revealed that Philip Graham's Visa, which has a card number of 4477 0780 0009 2751, had been billed $79.99 by "ADSOFT" with a date of May 23, 2006, and again with a date of June 16, 2006. This debit card number corresponds to the number for Philip Graham that had been retrieved from the JetPay database.

33

Exhibit 1

39.    A check with the Division of Motor Vehicles on or about June 21, 2007 revealed that an individual named Philip Graham, with a date of birth of October 09, 1974, resides at the SUBJECT PREMISES.

40.    On or about October 15, 2007, representatives of the United States Postal Service informed ICE agents that Philip Graham is currently receiving mail at 1300 Cynwyd Club Drive, Apt. 7, Wilmington, DE (the "SUBJECT PREMISES").

41.    Surveillance of the SUBJECT PREMISES on several occasions in September and October, 2007 revealed that a vehicle with Delaware license plate number 78926 parks in the parking lot at the SUBJECT PREMISES. That vehicle is registered to Philip Graham, at the address of the SUBJECT PREMISES.

42.    Based upon the information provided via the database recovered from JetPay, the "Illegal CP" subscription website database, Artisans' Bank, the bank which issued Philip Graham's debit card, representatives of the United States Postal Inspection Service and surveillance of the SUBJECT PREMISES, there is probable cause to believe that the individual named Philip Graham lives at the SUBJECT PREMISES and has received child pornography at this location.

## Specifics Regarding the Seizure and Searching of Computer Systems

43. Based on my own experience and consultation with other agents who have been involved in the search of computers and retrieval of data from computer systems and related peripherals, and computer media, there are several reasons why a complete search and seizure of information from computers often requires seizure of all electronic storage devices, as well as all

34

Exhibit 1

related peripherals, to permit a thorough search later by qualified computer forensic agents or

experts in a laboratory or other controlled environment:

    a.   Computer storage devices, such as hard disks, diskettes, tapes, laser disks, compact discs, and DVDs, can store the equivalent of hundreds of thousands of pages of information. Additionally, when an individual seeks to conceal information that may constitute criminal evidence, that individual may store the information in random order with deceptive file names. As a result, it may be necessary for law enforcement authorities performing a search to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This review and sorting process can take weeks or months, depending on the volume of data stored, and would be impossible to attempt during a search on site; and

    b.   Searching computer systems for criminal evidence is a highly technical process, requiring specialized skill and a properly controlled environment. The vast array of computer hardware and software available requires even those who are computer experts to specialize in some systems and applications. It is difficult to know before a search what type of hardware and software are present and therefore which experts will be required to analyze the subject system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

    44.    Based on my own experience and my consultation with other agents who have

been involved in computer searches, searching computerized information for evidence or

instrumentalities of a crime often requires the seizure of all of a computer system's input and

output peripheral devices, related software, documentation, and data security devices (including

passwords) so that a qualified computer expert can accurately retrieve the system's data in a

Exhibit 1

laboratory or other controlled environment. There are several reasons that compel this conclusion:

45.    The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

46.    In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases like the instant one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

47.    I am familiar with and understand the implications of the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware that any of the materials to be searched and seized from the SUBJECT PREMISES are protected materials pursuant to the PPA. If any such protected materials are

36

Exhibit 1

inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

## Conclusion

48. Based on the above information, there is probable cause to believe that 18 U.S.C. §§ 2252 and 2252A, which, among other things, make it a federal crime for any person to knowingly possess and/or receive or attempt to receive child pornography, have been violated, and that evidence, fruits and instrumentalities of these offenses, as set forth in ATTACHMENT B are located at the SUBJECT PREMISES.

Your Affiant requests authority to seize such material.

49. Based upon the foregoing, this Affiant respectfully requests that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in ATTACHMENT A, authorizing the seizure of the items described in ATTACHMENT B.

William O. Horn
Special Agent, ICE

Subscribed and sworn before me

this 22ⁿᵈ day of October, 2007.

HON. Leonard P. Stark
United States Magistrate Judge

37

Exhibit 1

# United States District Court

_____ DISTRICT OF ____ DELAWARE

UNITED STATES OF AMERICA
V.

PHILLIP W. GRAHAM

## CRIMINAL COMPLAINT

CASE NUMBER:  07- 220 M

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __May 23, 2006, through October 26, 2007__ in __New Castle__ county, in the

_____ District of __Delaware__ defendant(s) did, (Track Statutory Language of Offense)

knowingly receive and attempt to receive and possess visual depictions of minors engaged in sexually explicit conduct which images had moved by computer in interstate commerce

in violation of Title __18__ United States Code, Section(s) __2252A(a)(2) and (5)(B)__

I further state that I am a(n) __U.S. Immigration & Customs Enforcement Special Agent__ and that this complaint is based on the following

Official Title

facts:  AFFIDAVIT attached.

Continued on the attached sheet and made a part hereof:     ☒ Yes    ☐ No

Signature of Complainant
Brian G. Maher, Special Agent
U.S. Immigration and Customs Enforcement

Sworn to before me and subscribed in my presence,

__November 7, 2007__
Date

at     __Wilmington, Delaware__
City and State

Honorable Mary Pat Thynge
United States Magistrate Judge
Name & Title of Judicial Officer

Exhibit 1

Signature of Judicial Officer

I, Brian Maher, being duly sworn, depose and say:

1.      I am a Special Agent with the United States Department of Homeland Security, Bureau of Immigration & Customs Enforcement (ICE), Wilmington, Delaware. I have been employed as a Special Agent for over five years. During this time I have conducted and participated in numerous investigations of violations of U.S. immigration law and U.S. customs laws.

2.      Pursuant to 18 U.S.C. § 2251 et seq., I am authorized to investigate crimes involving the sexual exploitation of children. Sections 2252 and 2252A make it a federal crime for any person to knowingly receive or distribute child pornography that has been mailed or has been shipped or transported in foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer. That section also makes it illegal to knowingly reproduce any visual depiction for distribution in foreign commerce by any means including by computer or through the mails.

3.      I have conducted and participated in investigations of persons suspected of violating federal child pornography laws, including Title 18 U.S.C. §§ 2251, 2252 and 2252A. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256) in digital media.

4.      On October 22, 2007, a Federal Search Warrant (Number 07-202M) was issued by the Honorable Leonard P. Stark, U.S. Magistrate Judge for the District of Delaware, authorizing the search of the premises at Philip Graham's residence. The issuance of the search warrant was predicated upon, among other things, probable cause to believe that Philip Graham had purchased subscription access on or about May 23, 2006, and then again on or about June 16, 2006, to a commercial website labeling itself "Illegal.CP," and clearly identifying itself on its banner page as one of the best child porn sites on the internet. The access was purchased with a VISA debit card with a specific number.

5.      On October 26, 2007, pursuant to that Search Warrant, ICE Agents seized several personal computers, one of which was functional, and related peripherals and computer media from the residence of Philip Graham.

6.      On October 26, 2007, detectives with the Delaware State Police (DSP) initiated a preliminary examination of the hard drive from the functional computer seized from Philip Graham. This analysis has discovered on this computer's hard drive approximately 1,000 still images of child pornography and child erotica and approximately 100 videos of child pornography and child erotica. It appears that about half of the 1,000 images have been downloaded to this computer since June 1, 2007. A significant number of these images and videos depict prepubescent children. These images and videos are organized into folders and

Exhibit 1

subfolders with such titles as "Lolita Art," "Lost Lolita Archives," "Teen Models," "Pre-Teen Models," and "Hard." There is one video file entitled "Rep2.avi" which appears to depict the rape of a prepubescent child by an adult. There is another video entitled "Suckhim2.mpg," which appears to depict a prepubescent child performing oral sex on an adult male.

7.     On November 6, 2007, ICE Special Agents conducted a non-custodial interview of Philip Graham at his residence. In the course of this interview, Philip Graham stated that he uses his computer and the internet primarily for playing online games and looking for Japanese *animé* art. He stated that he had seen a number of images and videos containing child pornography from various internet Websites during the last four years, but that he never downloaded any of it.

Philip Graham stated that he had used BitTorrent to look for Japanese *animé*, but that he couldn't find any. Being unable to find the *animé*, he stated that he searched on boys' and girls' names, out of boredom. In response to those searches, he found a number of nude images. He stated that the nude "guys" were "disgusting," so he searched for girls' names. In response to those queries, numerous photos were returned, from "Kid Art" to adult pornography. He specifically recalled seeing "art" for "Sarah" and "Karen." Photos of Sarah appeared to range in age from about 5 to about 16 years old, and photos of Karen appeared to range from about 6 or 7 to about 40 years old.

Philip Graham stated that on one occasion, he attempted to download the *Star Wars Christmas Special*, but, when he opened the file, it contained a photographic collection titled *Sarah Model*, a collection of nude photographs of a girl from the age of approximately 5 or 6 years old to approximately 15 or 16 years old. He referred to her as the "faceless model," since some of the younger photos did not show her face.

Philip Graham stated that he had subscribed once to a Website called "unet.com" or "unicet.com," for a period of 30 days, to look for Japanese *animé*. Although he found no *animé*, there were pictures of cars, "adult stuff," nude women, men and "kid models." He stated that the "kid models" were "little kids dressed up in clothes."

Philip Graham stated that a friend of his, whom he identified by name, used to stay with him occasionally, until approximately five to seven months ago. If they went out drinking, this friend would stay at Graham's house or Graham would stay at his house overnight. Graham stated that this friend would stay at his house two or three times a week or Graham would stay at the friend's house two or three times a week, essentially alternating between the two on a weekly basis.

Philip Graham stated that he possesses only one general use payment card, a VISA debit card from Artisan's Bank. Graham presented the card to the interviewing agents. The card is a VISA debit card with the same number as the

Exhibit 1

credit card referenced above in paragraph 4 and valid from 10/07 to 10/09. Graham also presented the recently expired predecessor card, which bore the same number and had been valid from 10/05 to 10/07.

WHEREFORE, your affiant avers that there is probable cause to believe that Philip Graham knowingly received and possessed child pornography, visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252, and 2252A.

Brian G. Maher
Special Agent
Immigration & Customs Enforcement

Exhibit 1