IN THE FEDERAL DISTRICT COURT FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA

                Plaintiff,

vs.                                   CASE NO. CR 07-157-SLR

PHILIP GRAHAM,

                Defendant.

---

SENTENCING MEMORANDUM OF PHILIP GRAHAM

---

I.    <u>INTRODUCTION</u>

       Graham was plead guilty to a single count of possession of child pornography. See Plea Agreement. As a result of his plea, he waived significant constitutional and trial rights and the government avoided the time, expense and risk of a trial.

       Graham's plea logically means he accepts the government's representations that at least one image he possessed meets one of the definitions of "child pornography" contained in 18 U.S.C. 2256(8). The plea contains no other admissions or agreements.

II.    <u>ADVISORY NATURE OF GUIDELINES AND SENTENCING FACTORS</u>

       On January 12, 2005, the Supreme Court ruled that its Sixth Amendment holding in <u>Blakely v. Washington</u> (2004, 542 U.S. 296 and <u>Apprendi v. New Jersey</u> (2000), 530 U.S. 466, applies to the Federal Sentencing Guidelines. <u>United States v.</u>

<u>Booker</u> (2005), 543 U.S. 220; 125 S. Ct. 738).  Given the mandatory nature of the Sentencing Guidelines, the Court found "no relevant distinction between the sentence imposed pursuant to the Washington statutes in <u>Blakely</u> and the sentences imposed pursuant to the Federal Sentencing Guidelines" in the cases before the Court.  (<u>Id</u>. at 751).  Accordingly, reaffirming its holding in <u>Apprendi</u>, the Court concluded that

> [a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum <u>authorized by the facts established by a plea of guilty</u> or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.

(<u>Id</u>. at 756)  (Emphasis added).

Based on this conclusion, the court further found those provisions of the Federal Sentencing Reform Act of 1984 that makes the Guidelines mandatory, 18 U.S.C. §3553(b)(1) or which rely upon the Guideline's mandatory nature, 18 U.S.C. §3742(e), incompatible with its Sixth Amendment holding.  (<u>Booker</u>, 125 S. Ct. 756).  Accordingly, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory."  (<u>Id</u>. at 757).

Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by <u>Booker</u>:

> Requires a sentencing court to consider Guideline ranges, see 18 U.S.C.A. §3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a).

(Booker, 125 S. Ct. at 757).  Thus, under Booker, sentencing courts must treat the

guidelines as just one of a number of sentencing factors set forth in 18 U.S.C.

§3553(a).

In determining the minimally sufficient sentence, §3553(a) further directs

The primary directive in § 3553(a) is for sentencing courts to "impose a

sentence sufficient, but not greater than necessary, to comply with the purposes set

forth in paragraph 2."  Section 3553(a)(2) states that such purposes are:

> (A)   to reflect the seriousness of the offense, to promote respect for the
> law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner.

In determining the minimally sufficient sentence, §3553(a) further directs

sentencing courts to consider the following factors:

> 1)   the nature and circumstances of the offense and the history and
> characteristics of the defendant (§3553(a)(1);
> 2)   the kinds of sentences available (§3553(a)(3);
> 3)   the need to avoid unwarranted sentence disparities among
> defendants with similar records who have been found guilty of similar
> conduct (§3553(a)(6); and
> 4)   the need to provide restitution to any victims of the offense.
> (§3553(a)(7).

Other statutory sections also give the district court direction in sentencing.

Under 18 U.S.C. §3582, imposition of a term of imprisonment is subject to the

following limitation: in determining whether and to what extent imprisonment is

appropriate based on the Section 3553(a) factors, the judge is required to

"recognize[s] that imprisonment is not an appropriate means of promoting

correction and rehabilitation."

The United States Supreme Court has held that a district court acts

appropriately in sentencing a defendant to probation even though a strict guidelines

calculation calls for prison time. This is true provided the court considers all

sentencing factors in 3553(a) despite any difference of opinion a reviewing court

may have about the application of those factors to the court's decision. (Gall v. U.S.

128 S.Ct. 586).

Under 18 U.S.C. §3661, "no limitation shall be placed on the information

concerning the background, character, and conduct of [the defendant] which a court

of the United States may receive and consider for the purpose of imposing an

appropriate sentence" (emphasis added). This statutory language certainly

overrides the (now-advisory) policy statements Part H of the sentencing guidelines,

which list as "not ordinarily relevant" to sentencing a variety of factors such as the

defendant's age, educational and vocational skills, mental and emotional conditions,

drug or alcohol dependence, and lack of guidance as a youth. (See U.S.S.G. §5H1.

See also United States v. Nellum (N.D. Ind. Feb. 3, 2005), 2005 WL 30003, 2005

U.S. Dist. LEXIS 1568 (Simon, J. (taking into account fact that defendant who was

57 at sentencing, would upon his release from prison have a very low likelihood of

recidivism since recidivism reduces with age; citing Report of the U.S. Sentencing

Commission, Measuring Recidivism: the Criminal History Computation of the

4

Federal Sentencing Guidelines, May, 2004); <u>United States v. Naylor</u> (W.D.Va. Mar. 7, 2005), ___ F. Supp. 2d___, 2005 WL 525409, *2 (Jones, J.) (concluding that sentence below career offender guideline range was reasonable in part because of defendant's youth when he committed his predicate offenses – he was 17 – and noting that in <u>Roper v. Simmons</u> (2005), 125 S. Ct. 1183, 1194-96, the Supreme Court found significant differences in moral responsibility for crime between adults and juveniles)).

The directives of <u>Booker</u> and §3553(a) make clear that courts may no longer uncritically apply the guidelines.  Such an approach would be "inconsistent with the holdings of the merits majority in <u>Booker</u>, rejecting mandatory guideline sentences based on judicial fact-finding and the remedial majority in <u>Booker</u>, directing courts to consider all of the §3553(a) factors, many of which the guidelines either reject or ignore." (<u>United States v. Ranum</u> (E.D. Wisc. 2005), 353 F. Supp. 2d 984.  <u>See also</u> <u>United States v. Ameline</u> (9th Cir. 2005), 400 F. 3d 646, 655-56 (advisory guideline range is "only one of many factors that a sentencing judgment must consider in determining an appropriate individualized sentence"), <u>reh'g en banc granted</u>, 401 F. 3d 1007 (9th Cir. 2005)).

Justice Scalia explains the point well in his dissent from <u>Booker</u>'s remedial holding:

> Thus, the logic compels the conclusion that the sentencing judge,
> after considering the recited factors (including the guidelines),
> has full discretion, as full as what he possessed before the Act

5

> was passed, to sentence anywhere within the statutory range.  If
> the majority thought otherwise – if it thought the Guidelines not
> only had to be 'considered' (as the amputated statute requires)
> but had generally to be followed – its opinion would surely say
> so.

(Booker, 125 S. Ct. at 791 (Scalia, J.,  dissenting in part)).  Likewise, if the remedial

majority thought the guidelines had to be given "heavy weight", its opinion would

have said so.  The remedial majority clearly understood that giving any special

weight to the guideline range relative to the other Section 3553(a) factors would

violate the Sixth Amendment.

In sum, in every case, a sentencing court must now consider all of the

§3553(a) factors, not just the guidelines, in determining a sentence that is sufficient

but not greater than necessary to meet the goals of sentencing.  And where the

guidelines conflict with other sentencing factors set forth in §3553(a), these

statutory sentencing factors should generally trump the guidelines.  (See United

States v. Denardi (3rd Cir. 1989), 892 F. 2d 269, 276-77 (Becker, J., concurring in

part, dissenting in part) (arguing that since §3553(a) requires sentence be no

greater than necessary to meet four purposes of sentencing, imposition of sentence

greater than necessary to meet those purposes violates statute and is reversible

even if within guideline range)).

**III.    PRESENTENCE REPORT**

The presentence report (PSR) contains numerous factual claims that are inaccurate or that are inappropriate for the court's consideration under either the guidelines or statutory factors of §3553(a).

In paragraph 22 of the PSR, the sentencing guideline calculation enhancement of 2 points is based entirely on the claim that Mr. Graham possessed at least one image of an actual minor engaged in prohibited conduct under 18 U.S.C. 2252, et seq. whose age was 12 years or younger   This claim is based solely upon hearsay from law enforcement.  There have been no admissions by Mr. Graham nor evidence presented by the government and accepted by the court substantiating this claim.  In paragraph 23, the government's calculation includes an enhancement alleging that Graham possessed an image that "portrays sadistic or masochistic conduct or other depictions of violence."  This is not a fact established by Graham's plea nor any other evidence.  In paragraph 25, the government claims another enhancement claiming Graham possessed more than 600 images that met the definition of child pornography in 18 U.S.C. 2256(8).

These claims made by the government and law enforcement officers are not "facts established by [Graham's] plea of guilty."  (Apprendi at 756).

Graham's plea established he had possessed "child pornography."

Despite hearsay being permitted at sentencing hearings, not all consideration of hearsay testimony at sentencing proceedings is permissible.  The Due Process Clause "is plainly implicated at sentencing," even though it does not require at

7

sentencing "all the procedural safeguards and strict evidentiary limitations of the criminal trial itself."  (United States v. Fatico, 603 F.2d 1053, 1054 (2d Cir.1979) United States v. Egge, 223 F.3d 1128, 1132 (9th Cir.2000) ("Although the Confrontation Clause does not apply at sentencing, a defendant clearly has a due process right not to be sentenced on the basis of materially incorrect information. Due process requires that some minimal indicia of reliability accompany a hearsay statement.")

Graham "has a due process right to be sentenced on the basis of reliable information" (United States v. Tucker, 404 U.S. 443 (1972)).

Image Counts

The claim that his computer contained more than 600 images is pure hearsay. At trial, the government would have had to prove the existence of each of these 600 + claimed images and that each one depicted an actual minor engaged in the conduct depicted.  This is an arduous task, if it is even possible, to say the least. The government avoided the labor, expense and risk of failing at proving those 600 images when Graham plead guilty.  The use of this hearsay at sentencing, to increase Graham's guideline calculation, is an end run around Graham's significant abandonment of his trial rights.  In fact, allowing this hearsay at sentencing essentially makes sentencing much easier than trial for the government permitting the admission of evidence the government, in all likelihood, would never have been able to prove at trial given the huge number of claimed images.

This statement is not merely hearsay, but double and in some cases, triple hearsay. It does not contain sufficient reliability even for a sentencing hearing. In addition, the use of such unreliable information impinges on Graham's constitutional right, albeit repugnant, identified by the Supreme Court in (<u>Free Speech Coalition</u> (2002), 122 S.Ct. 1389, 535 U.S. 234).

The U.S. Supreme Court has declared that citizens have a right to possess images that "appear to depict" minors engaged in prohibited conduct. (Id). No case law supports an enhancement or even consideration of constitutionally protected material as a basis for increasing the guideline range or underlying sentence for Graham. It defines unfairness to increase a guideline range or sentence based upon a citizen's possession of constitutionally protected material.

Therefore, before any consideration can be given for image content related to this case, the government must produce reliable information supporting a belief that the image depicts an actual minor actually engaged in the conduct depicted (i.e. is illegal child pornography) versus an image that merely "appears to be" illegal and is constitutionally protected. (See <u>Free Speech Coalition</u>). Although a typical sentencing only requires the mere preponderance standard, given the constitutional free speech implications in this case, that standard should be applied rigorously. Meaning, the presentation of no evidence or even some evidence should not be sufficient to meet the preponderance (51% in the government's favor) standard.

<u>Multiple Layers of Hearsay Being Offered to Prove Images Depict Actual Minors</u>

9

The PSR does not state, but it is evident the claim that more than 600 illegal images were found on Graham's computer is at least one layer of hearsay the probation officer is providing. The officer completing the PSR received the information from an investigator in Graham's case. That investigator has no personal knowledge of the authenticity of all of the 600 images (nor even personal knowledge of the authenticity of even one of them). Paragraph 12 makes clear that the government has not disclosed, if it even knows, the identity of even one person contained in any of the images it relies upon for the enhancements.

Layers of Hearsay Underlying even Law Enforcements Claims

An alleged victim or perpetrator informs an investigator, let's say in Brazil, that images captured of child sexual abuse they participated in creating are real. That investigator copies those images and submits those copies to the database with perhaps an affidavit, judgment of conviction or other transcript. There is no set requirement of accompanying information and database images are associated with a wide variety of accompanying information. A suspect in the U.S. is arrested and indicted. Images from his computer are copied and sent to the database and matched to those from the Brazilian case. The investigator in that U.S. case is told by the database operator that images he submitted match those from a Brazilian case, previously submitted to the database. In some cases, the Brazilian investigator is never told by either the alleged victim or alleged perpetrator the images he recovered (and subsequently submitted to the database) are authentic,

10

but merely relies upon a jury finding of guilt in Brazil, guilty plea to some of the charges in the matter or other judicial findings. Of course, even a finding of guilt or a conviction or, in some cases, a confession by an alleged perpetrator is not proof that every image (or any image) seized is authentic. The claim by the author of the PSR about the 600 images and their authenticity is, at best, triple or perhaps quadruple hearsay in some cases as noted in the illustration above. Moreover, the failure to clearly distinguish these images from realistic, but legal, images that appear to depict a minor eviscerates the constitutional right outlined in <u>Free Speech Coalition</u>.

<u>Government witnesses and this Court Lack the Capacity to Detect Whether a Given Image is Altered (Legal) or Unaltered (Illegal)</u>

Without testimony of a person who participated in the creation of a digital image, no authenticity of the claimed images can be determined. Therefore, there is no indicia of reliability that even the looser standards of sentencing hearings require.

The senior judge for the 1st Circuit recently held that it is impossible for anyone to know by looking what they are dealing with, i.e. constitutionally protected or felonious.

> Technological advances in recent years have been such that an untrained eye simply cannot easily distinguish a photograph of a real person from a virtual image by merely eyeballing the photographs in question. Indeed, determining whether an image is real or virtually created is not only no longer within the "range of normal experience and knowledge" of the average person, but it

> may also very well be difficult for even experts [to say] whether the
> pictures were made by using real children or by using computer
> imaging.... The scientific evidence available today is
> overwhelmingly contrary to that which existed in <u>Nolan</u>'s day....
> There is simply no question that today it is possible to create virtual
> images of humans that are indistinguishable from the real thing.
> (<u>United States v. Wilder</u> 2008 WL 2009671 (C.A.1) (May 12, 2008)).

This conclusion tracks several other cases in which government and defense experts in digital imaging have testified likewise.

<u>U.S. v. Frabizio</u> (August 11, 2006) 2006 WL 2384836 represents a probing and detailed analysis of the offered government digital imaging expert witness, Thomas Musheno.  During his hearing at an expert qualification hearing, Musheno admitted he lacked the capacity to determine if a given digital image was altered or unaltered.

The court analyzed the requirements under Federal Rule of Evidence 702 as well as <u>Daubert v. Merrell Dow Pharmaceuticals, Inc</u>., 509 U.S. 539 (1993) to determine if Musheno had the capacity to visually examine an image and determine whether it was protected or prohibited.  The court held that he did not.  (<u>Frabizio</u>, generally).  The court excluded Musheno as a digital imaging expert witness.  (Id).

The court characterized Musheno's approach as "eyeballing the evidence" (Id. at 5); "akin to permitting a dentist to opine about the cause of glaucoma" (Id); this process "could not be a more subjective inquiry" (Id). at 7; "[providing] no way of determining whether [the purported expert's] years of experience add up to actual expertise." (Id); "[A] technique [that] has never been tested, its error rate is

12

unknown and therefore does not support a finding of reliability." (Id). at 11;  "More disturbingly, no standards govern the conclusions….[N]o guidelines for the number or type of factors that should be present to conclude that an image is real."  (Id).

Frabizio went beyond merely excluding Musheno.  The Frabizio court addressed the "threshold question [of] whether visual observation is at all appropriate to the task at hand: distinguishing real images from virtual ones."  (Id. at 2).  Again, it relied solely on the government's current expert, Musheno, as well as testimony and scholarly articles by the government's former expert, Professor Hany Farid.  The court's conclusion is clear.  "Based on the evidence presented to me about the current state of technology and the specific images involved here, I conclude that neither an expert witness nor a lay jury, using only visual means, [has the capacity to] determine whether the images in this case are real or virtual to the level of certainty required in a criminal prosecution."  (Id. at 2).  (Emphasis added).

"[T]he evidence strongly suggests that it is extremely difficult, if not impossible, for a photographic expert, let alone a lay observer, to determine whether the images involved in the instant case are real images or images created or manipulated through digital technology."  (Frabizio at 4).  (Emphasis added).  Frabizio represents both an admission of lack of capacity by the government's leading digital imaging expert and a court's finding consistent with that admission.

13

Logically, persons with the same claimed expertise as Musheno lack the capacity to "determine whether the images involved" are protected or prohibited. Persons with less claimed expertise than Musheno also lack that capacity. No investigator or detective or even this court has the capacity to reliably determine if any image in this case "are real images or images created or manipulated through digital technology." (Frabizio at 4).

Graham concurs with the opinion in Frabizio and the concurrence in Wilder. He also concurs with the excerpted portion of Musheno's testimony in which he "conceded that it is possible to alter an image in a manner that is undetectable. He testified that because of this, he never opines that an image is real on the basis of a single image. In such cases, he limits his conclusions to 'appears to be real' and no conclusion." (Frabizio at 7).

There is no case decision, federal or state, in which a government expert witness has testified that they have the capacity to know whether a given digital image is protected by the constitution or prohibited by the statute. No government witness will testify to that capacity in this case either. Any witness claiming they have such a capacity or that Graham does will endure the same examination as Musheno in Frabizio. Their claim will suffer the same fate as Musheno's as well. Likewise, any claim that this court can merely examine the images or videos for itself and "know" that they depict actual minors is technologically false.

14

Before the court's conclusion in <u>Wilder</u> and Musheno's concession of this lack of capacity in <u>Frabizio</u>, several other law enforcement digital imaging and computer experts have also admitted this lack of capacity.  (<u>U.S. v. Fox</u>, 248 F.3d 394, 403 (5th Cir.2001) (Government's computer expert conceded he lacked the capacity to know whether a person depicted in a digital image actually exists); <u>U.S. v. Ellyson</u>, 326 F.3d 522, 532 (4th Cir.2003) (Government's agent testified he lacked the capacity to know whether some of the digital images possessed by the Defendant and introduced into evidence were created using actual minors or not); <u>State v. May</u>, 362 N.J.Super. 572, 829 A.2d 1106, 1111 (N.J.Super.Ct.App.Div.2003) (State's expert conceded his lack of capacity to distinguish between an actual minor in a digital image and a digital image of a minor that is created or manipulated using a computer).

As repugnant as apparent images of child pornography are, the Supreme Court has protected their mere possession.  (<u>Free Speech Coalition</u>, supra).  That First Amendment protection means nothing if possessing such repugnant, although constitutionally protected, items can be the basis for an enhanced sentence under the guidelines.  Without the testimony of a person who participated in the creation of these 600 or so alleged illegal images or the others underlying the other two enhancements, this court will never know if it is enhancing Graham's sentence based upon real, illegal images, or constitutionally protected, but apparently real images.

15

The burden for proving the 600 images are unaltered actual minors engaged in the acts depicted, even by a preponderance of the evidence at a sentencing, remains with the government.  Graham has no duty to disprove that they depict actual minors engaged in the acts depicted.

> If the evidentiary issue [of proving a particular image is of an actual minor as opposed to a virtual minor] is a serious problem for the government, as it asserts, it will be at least as difficult for the innocent possessor.  The statute, moreover, applies to work created before 1996, and the producers themselves may not have preserved the records necessary to meet the burden of proof.  Failure to establish the defense can lead to a felony conviction.
>
> [T]he affirmative defense cannot save the statute, for it leaves unprotected a substantial amount of speech not tied to the government's interest in distinguishing images produced using real children from virtual ones.  (Free Speech Coalition).

Graham plead guilty to possession of child pornography.  That plea is consistent with pleading to possession of a single image of child pornography as that is the minimum conduct sufficient to satisfy a violation of the statute.  As such, this case is sufficiently outside the heartland of these cases.  Therefore, his case warrants a downward departure from the advisory guideline range.  Possessing a single image reflects the fact that Mr. Graham was not intending to accumulate and store these images to fulfill a desire to have inappropriate contact with minors.  There is no evidence that Mr. Graham attempted to contact a minor child nor had any role in the creation or distribution of these images.

The Kinds of Sentences Available

16

In this case, the Court has a rare opportunity to fashion a sentence that does more than simply punish the defendant. After Booker, however, the sentencing guidelines are not binding and courts have discretion to impose split sentences, or sentences of probation, even when the defendant falls within Zone D of the sentencing table. Many courts have done precisely this. See, e.g. United States v. Jones (D. Maine 2005), 352 F.Supp. 2d 22, 25 (varying from guidelines to impose sentence of home confinement despite the fact that the departure under sentencing guidelines not warranted); United States v. Kelley, (D. Neb. 2005), 355 F.Supp. 2d 1031 (sentence of home detention); United States v. Niemoeller, (S.D. Ind. July 15, 2005), No. 02-09-CR-1, 2005 WL 1799456 (same); United States v. Anderson (D. Maine 2005), 365 F.Supp. 2d 67 (split sentence).

The pre-sentence investigation report determines Defendant's sentencing guideline range as below:

| Factor | | Total |
|---|---|---|
| Base Offense | | 18 |
| Possessed Images depicting actual minors under the age of 12 | | 2 |
| Possessed Images depicting sadistic or masochistic conduct | | 4 |
| A computer was used by Graham | | 2 |
| Possessed images numbering more than 600 | | 5 |
| | Subtotal | 31 |
| Reductions | | |
| Acceptance of Responsibility | | -3 |
| | Total | 28 |

17

After eliminating the items in the calculation that were not established by the facts of the plea and/or are based on inadmissible double and triple hearsay or just not amenable to visual authentication, the calculation is adjusted as follows:

| Factor | | Total |
|---|---|---|
| Base Offense | | 18 |
| ~~Possessed images depicting actual minors under the age of 12~~ | | ~~2~~ |
| ~~Possessed images depicting sadistic or masochistic conduct~~ | | 4 |
| A computer was used by Graham | | 2 |
| ~~Possessed images numbering more than 600~~ | | ~~5~~ |
| | Subtotal | 20 |
| Reductions | | |
| Acceptance of Responsibility | | -3 |
| | Total | 17 |

That properly places Graham's guideline range at 24-30 months, not the 78-97 months indicated by the calculation in the PSI of a level 28. Further reductions from that calculation are appropriate as indicated above. His possession of one image of child pornography places his case outside the heartland of other cases. His lack of any significant criminal record and the anticipated continuing support of his parents also speaks well of his suitability for a downward departure.

To sentence a defendant outside of the guideline range, the district court must determine that the case falls outside of the heartland of cases in the guideline range. (Koon v. United States, 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). In order to determine that a case falls outside of the heartland, the district court must conduct "a refined assessment of the many facts bearing on the outcome,

informed by [the district court's] vantage point and day-to-day experience in criminal sentencing." (<u>Koon</u>, 518 U.S. at 98, 116 S.Ct. 2035).  Furthermore, the district court must determine the size of the departure by tying it to the structure of the sentencing guidelines, and the size of the departure must be reasonable given the factors sentencing courts are required to consider and the facts of the case. (<u>United States v. Crouse</u>, 145 F.3d 786, 792 (6th Cir.1998);  see also 18 U.S.C. 3742(e)(3)(C)).

   In determining the minimally-sufficient sentence, the Court must essentially ask whether a more severe sentence would achieve greater justice, deterrence, incapacitation, or rehabilitation.  Respectfully, it would not in this case. In making this judgment, it is important to examine what Mr. Graham has already suffered as a result of his conduct and this prosecution. While these consequences are not a complete substitute for judicial punishment, they are critically important to assessing what further punishment is necessary in this case. Because such consequences satisfy some of the purposes of punishment, they are widely recognized as grounds for departure under the sentencing guidelines. <u>See, e.g.</u> <u>United States v. Speed Joyeros, S.A.</u> (E.D.N.Y. 2002), F. Supp. 2d 412, 439-40; <u>United States v. Redemann</u> (E.D. Wis. 2003), 295 F. Supp. 2d 887, 894-97; <u>United States v. Gainad</u> (S.D.N.Y. 1993), 829 F. Supp. 669, 670-71.

<u>Mental Health Issues</u>

19

As the PSR notes, Mr. Graham has had significant emotional, social and psychological problems since his childhood.  His parents have struggled mightily to support their son throughout a litany of trials brought on by his psychological problems.  It is without a doubt that these psychological problems are at the heart of his decisions to engage in the conduct to which he plead guilty.

<u>The Guidelines Unlawfully Restrict The Role That Mental And Physical Infirmities May Play At Sentencing</u>

The Guidelines generally forbid consideration of mental illness as a reason for a downward departure, <u>USSG § 5H1.3</u>, unless that mental illness is "significant[]" and itself " contributed substantially to the commission of the offense," <u>USSG § 5K2.13</u>.  This formulation produces two unfortunate results. First, contrary to <u>Section 3553(a)(2)(D)</u>, the Guidelines discourage courts from taking individuals' psychiatric needs into account for incarceration purposes. Second, they unduly constrain judges from taking mental illness into account in assessing culpability.

Even where those conditions are met, the Guidelines forbid courts from departing downwards where the mental impairment was intoxicant-induced or where the defendant must be incarcerated to "protect the public." Id.

<u>The Guidelines Violate Section 3553(a)(2)(D) By Constraining Judges From Considering Defendants' Mental Health Needs At Sentencing</u>

<u>Section 3553(a)</u> requires the sentencing court to "consider … the need for the sentence imposed … to provide the defendant with needed … medical care [] or

other correctional treatment in the most effective manner." <u>18 U.S.C. § 3553(a)(2)</u> <u>(D)</u>. That statutory imperative means that, where possible, sentences should accommodate the needs of defendants whose medical conditions cannot be treated as effectively in prison as elsewhere. See <u>United States v. Duhon, 440 F.3d 711, 715</u> <u>(5th Cir.)</u>, pet. for cert. filed (U.S. May 18, 2006) (No. 05-1114) (district court's conclusion that defendant's "psychiatric rehabilitation would be best served with a probationary sentence that would allow him to continue treatment with his current psychologist … was consistent with subsection (2)(D)'s mandate to consider the need to provide the defendant with medical care in the most effective manner"); <u>United</u> <u>States v. Pallowick, 364 F. Supp. 2d 923, 930 (E.D. Wis. 2005)</u> (evaluating mental illness directly under <u>Section 3553(a)(2)(D)</u> and, in sentencing defendant to below-Guidelines period of incarceration, "conclud[ing] that sending defendant to prison for a lengthy period of time would not aid in his rehabilitation and might actually hinder the progress he made in counseling").

The Sentencing Guidelines thwart this statutory objective. They provide that while "[m]ental and emotional conditions" may be taken into account in crafting add-on conditions for probation or supervised release, they "are not ordinarily relevant in determining whether a departure is warranted." <u>USSG § 5H1.3</u>. Notably, the Guidelines' mental illness formulation lacks even the carve-out for " extraordinary … impairment" that courts may consider with respect to physical infirmities. See <u>USSG § 5H1.4</u> (departure on account of physical condition may be

21

reasonable, "e.g., in the case of a seriously infirm defendant, [where] home detention may be as efficient as, and less costly than, imprisonment"). Because the Guidelines thus discourage consideration of whether mentally ill defendants will receive continued medical treatment "in the most effective manner," they contravene Section 3553(a).

There is no principled reason to limit downward departures for physical infirmities to those that are "extraordinary," and generally only to cases where alternative punishment would be less costly than imprisonment. See USSG § 5H1.4.

Indeed, Department of Justice reports make clear that federal inmates are unlikely to receive proper psychiatric care. According to the Bureau of Justice Statistics (BJS), only 24 percent of federal prison inmates with mental health problems receive any sort of mental health treatment at any point during their incarceration. See U.S. DOJ, BJS, Mental Health Problems of Prison and Jail Inmates, 9, Table 14 (2006), available at http:// www.ojp.usdoj.gov/bjs/pub/pdf/mhppji.pdf. Moreover, as recently as 1997 (the most current data evaluated by the BJS in this respect), fewer than 60 percent of the most seriously mentally ill federal inmates had "[r]eceived any mental health service" since admission. See U.S. DOJ, BJS, Mental Health and Treatment of Inmates and Probationers, 9, Table 114 (1999), available at http:// www.ojp.usdoj.gov/bjs/pub/pdf/mhtip.pdf.

Mental Illness That Affects Culpability Should Be A Mitigating Factor In Sentencing, Even If It Was Not A Proximate Cause Of The Criminal Act

Mental illness is relevant to sentencing not just because prison environments tend to exacerbate mental problems, but also because sentencing judges traditionally had great discretion to take mental illness into account in assessing a defendant's culpability for his conduct. The Guidelines constrain that discretion by providing that mental illness can justify a downward departure under USSG § 5K2.13 only if the illness "contributed substantially to the commission of the offense." Id. Some, but not all, courts have construed this provision narrowly - to foreclose, for example, downward departures for individuals whose mental illnesses led them to the desperate straits from which they committed the crime, but did not directly cause the crime itself. See, e.g., United States v. Carucci, 33 F. Supp. 2d 302, 303 (S.D.N.Y. 1999) (rejecting downward departure under USSG § 5K2.13 because "a compulsive gambler is not, a fortiori, a compulsive illegal trader");[FN6] cf. United States v. Sadolsky, 234 F.3d 938, 943 (6th Cir. 2000) ("§ 5K2.13 does not require a direct casual link between the [significantly reduced mental capacity] and the crime charged").

This approach has contributed to the imprisonment of a disproportionately high number of individuals suffering from mental health problems. For example, the BJS has calculated that, "[a]t midyear 2005 … 45% of Federal prisoners" had at least one "mental health problem." Mental Health Problems of Prison and Jail Inmates at 1. That figure compares to "an estimated 11% of the U.S. population age 18 or older" who met a similarly broad measure of "mental health disorders." Id. at

3. When considering only the most seriously mentally ill - where estimates for the adult U.S. population typically run between 1 and 5 percent - the BJS has calculated that 7.4 percent of federal prisoners are mentally ill. See Mental Health and Treatment of Inmates and Probationers at 1-2.

To the extent the Guidelines narrow the circumstances in which mental illness may serve as a basis for sentencing leniency, they arbitrarily confine the traditional discretion of sentencing courts to take relevant mitigating factors into account. Indeed, the Sentencing Commission's adoption of USSG § 5H1.3 "represented a major change in course in criminal law, as it devalued the importance of mens rea - an element that had been an important factor in sentencing for more than a century." United States v. Shore, 143 F. Supp. 2d 74, 78 (D. Mass. 2001). This arbitrary constraint on sentencing discretion is particularly unfair to sex offenders, and not just because sex offenders are disproportionately likely to suffer from mental illness in the first place. It is also unfair because a sex offender's mental illness is often attributable to violent sexual experiences sustained as a youth who was molested.

Similar Sentences

This court recently sentenced several individuals for child pornography crimes with factors making those offenses more serious than Mr. Graham's.

Carl W. Wilson, Jr. faced a sentence of between 37 and 46 months according to the guidelines.  The government requested a sentence of 36 months, a downward departure from the guidelines.  This court sentenced Wilson to 2½ years.  Each of the other members or this ring of child pornography possessors and distributors received sentences starting at the low end of 22 months.  Graham did not distribute, offer to distribute or attempt to distribute any contraband image or legal image for that matter.  Graham's conduct was less serious than those involved in this child pornography ring.

Frank Kesting was sentenced to three years and one month in prison as a member of the same child pornography ring.  The government commented that Kesting never discussed or encouraged the molesting of children during his online conversations with other members of the ring.  Graham had no such conversations with anyone and therefore, likewise, did not encourage the harm to any minors.

A comparison of these two individuals and their sentences with Graham's background and offense characteristics, the offense to which he plead, properly place his sentence below the sentences deemed appropriate for these ring participants.

Conclusion

For the reasons discussed above, Graham respectfully requests that the Court impose a sentence at or below the minimum of the guideline range indicated by the calculation above of a guideline level of 17.

Respectfully Submitted,

/s/ Clayton Sweeney                          /s/ Dean Boland

PO BOX 55441                                 Dean Boland
Philadelphia PA 19127-5441                   18123 Sloane Avenue
1 (215) 509-1012 phone                       Lakewood, Ohio 44107
                                             216-529-9371 phone
                                             866-455-1267 fax
                                             dean@deanboland.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that one true and correct copy of the foregoing has been furnished to the Edmund Falgowski, Esquire., U.S. Attorney's Office, 1007 Orange Street, Suite 700 , P.O. Box 2046, Wilmington, DE 19899-2046 by filing through the CF/ECM electronic filing system this 10th day of August, 2008.

/s/

Clayton A. Sweeney, Jr., Esquire.